# Illinois Official Reports

## Appellate Court

*People v. Harris*, 2017 IL App (1st) 140777

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QUENTIN HARRIS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-0777 |
| Filed | March 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-06744; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Eric L. Leafblad, John E. Nowak, and Brandon Hudson, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1    The defendant appeals from his conviction for aggravated vehicular hijacking, arguing (1) that the State failed to prove that he had knowledge that his victim was deaf, so as to support the aggravated form of the offense of vehicular hijacking, and (2) that the prosecutor's conduct, including comments during opening and closing statements, deprived him of a fair trial. We find his contentions to be without merit and affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3    The defendant was charged with aggravated vehicular hijacking, vehicular hijacking, and attempted robbery in connection with a crime allegedly perpetrated against Carla Sarli-Roman on March 1, 2011. The aggravated vehicular hijacking charge was premised, in part, on the fact that Carla is deaf.

¶ 4    During opening statements at the defendant's trial, the prosecutor told the jurors that:

"Carla is in school. She is a young woman in her early 20's, and she is trying to get her license in cosmetology, cutting hair. ***

Carla used to drive to cosmetology school, but she can't drive there anymore. Her dad has to drive her, because back on March 1st, 2011, this defendant decided to take something that wasn't his."

¶ 5    The State called Carla as its first witness. Carla testified that she is deaf, but that she speaks Spanish and English, uses American Sign Language, and is able to read lips. Before asking her about the details of the alleged crime, the prosecutor elicited the following testimony:

"Q. Carla, are you in school now?

A. Yes.

Q. What are you learning to do in school?

A. To cut people's hair.

Q. All right. Do you drive to school, Carla?

A. No.

Q. And why don't you drive to school?

A. I don't have a car.

Q. Okay.

A. They stole it."

¶ 6    Carla testified that around 6:30 p.m. on March 1, 2011, she was leaving a clothing store in Calumet Park, Illinois, when three young men, including the defendant, approached and said "sexual things" to her. Carla tried to ignore the men and walked toward her car, a Ford Taurus. She entered the driver's seat of her car and tried to close the door, but one of the men held the door to prevent it from closing.

¶ 7    The men surrounded her and one of them asked for money. Carla testified that the defendant had his hand inside his coat pocket, insinuating that he was holding a gun. The defendant told her, "You know what this is" and then told her: "I don't want your money. I want your car." Carla testified that she was "terrified" and got out of the car. The defendant and the other two men took the vehicle and drove away. After a witness called police, Carla told the

responding officer what had happened and described the three men as young black males. On cross-examination, Carla acknowledged that she had been unable to describe the suspects' hairstyles or their clothing, other than that one of the men was wearing a skull cap.

¶ 8 Two days later, on March 3, 2011, Carla identified the defendant in a photographic array at the Calumet Park police station. On March 30, 2011, Carla also identified the defendant in a physical lineup of six individuals at the police station.

¶ 9 Carla testified that her car was recovered by police but that the car was damaged. She indicated that the car had no damage before it was taken from her on March 1, 2011.

¶ 10 At the end of direct examination, the prosecutor asked Carla: "How do you feel about not having a car now?" Carla responded: "I don't have a car no more. It is bad, you know. *** I want a car so bad because I can take it to school. That's why—that's really sad for me."

¶ 11 The State also called Chicago police officers Shelley Heberger and Kevin Connolly. Officer Heberger testified that on March 2, 2011, she and Officer Connolly were on patrol in an unmarked police car when they observed a Ford Taurus containing five or six individuals. Officer Heberger ran a computer inquiry on the vehicle's license plates, which revealed that it was a stolen vehicle. When the officers activated the police car's lights and sirens, the occupants of the Taurus, including the defendant, fled in different directions. Officer Heberger testified that the defendant looked in the police car's direction before he ran and that she saw the defendant's face. Officer Heberger secured the Taurus while Officer Connolly chased the suspects.

¶ 12 Officer Connolly also testified that he saw the defendant flee from the backseat of the Taurus. He testified that he saw the defendant's face and recognized the defendant from "previous contact with him."

¶ 13 Officer Connolly transmitted a "flash message" over police radio describing the subjects and asking for assistance. Officer Connolly apprehended the driver of the Taurus, a man named Temmy Dixon. Another officer in the area apprehended the defendant and returned him to the scene, where officers Heberger and Connolly identified him as one of the men who had fled the stolen car.

¶ 14 The State also called Detective John Shefcik of the Calumet Park police department. On March 2, 2011, he was informed that Chicago police had recovered Carla's stolen vehicle and had arrested two individuals, including the defendant. On March 3, 2011, Detective Shefcik met with Carla at the Calumet Park police station. He noticed that Carla had a hearing impairment but testified that they were still able to speak to each other.

¶ 15 Detective Shefcik showed Carla two photographic arrays, one including Dixon and a second array including the defendant. Carla did not identify anyone in the first array. In the second array, she identified the photograph of the defendant as the man who had asked her for money before taking her vehicle with two other men.

¶ 16 Detective Shefcik further testified that on March 30, 2011, Carla identified the defendant in a physical lineup at the police station. According to the detective, when Carla looked through the one-way mirror at the lineup, she began "crying and shaking" and said that she was "terrified."

¶ 17 The defense's theory of the case was that Carla had mistakenly identified the defendant as one of the men who had stolen her car and that the defendant was not one of the passengers seen in the stolen vehicle on March 2, 2011. At trial, the defense called one witness, Lasharn

Robinson, who testified that he was a friend of the defendant. Robinson testified that on the afternoon of March 2, 2011, he, the defendant, and another man were selling drugs on the corner of 120th Street and South Lafayette Avenue. Robinson received a call from someone who wanted to buy drugs and instructed the buyer to meet the defendant at a nearby location. Robinson testified that the defendant, who was carrying marijuana, was going to meet the buyer when a police vehicle approached. Robinson yelled to the defendant that the police were coming. According to Robinson, the defendant took off running westbound, and the police pursued him.

¶ 18 Robinson testified that he and his friend later searched for the defendant while they attempted to call his cell phone. Robinson saw the police vehicle he had seen before, which was parked. Robinson testified that "we had an idea that [the defendant] was in the [police] car because we heard the [defendant's] phone ringing." Robinson believed that the defendant had been taken into custody in connection with the marijuana.

¶ 19 The defendant elected not to testify. Following Robinson's testimony, the defense rested.

¶ 20 During closing arguments, the prosecutor made a number of comments about the impact on Carla of the loss of her car, including the following:

"That's her car. That was her car that she bought with her money that she used to go out into the community and do law abiding things. And it's safe to say that although she has accomplished great things in her life and continues to be a contributing member of society. She is in school. She probably enjoys freedom a little bit more than the average person. But now that is limited. And it's limited three years later *** because she doesn't have a car. And she can't afford a car. And so her dad drives her to school. And this is the level of respect that the defendant had showed her car. Her car was new. Her car had no previous damage to it. But after this car was recovered the very next day it was completely trashed. No respect. No respect at all."

¶ 21 The prosecutor subsequently argued: "This defendant taking that car from that young woman who was alone, ganging up on her, acting like he had a gun, that's injustice. This defendant robbing her of her motor vehicle is an injustice. *** The fact that [Carla] doesn't have a car today and has to rely on her dad, that's an injustice."

¶ 22 Separately, during rebuttal argument, the prosecutor stated:

"[The defendant] committed a crime and preyed upon one of the most vulnerable among us. Every day Carla Roman lives trapped in her disability. *** It makes her more vulnerable to someone like that. When you saw her testify there, you might have notice[d] she got very emotional when talking about how she didn't have a car anymore. Maybe at first that kind of seems a little strange. It's a car. It's an object. But to her this experience was more than that. It was something that terrorize[d] her. *** It wasn't just an object he took from her. He took from her her freedom, her ability to go out in the world and try to live as close to what we define as normal as she can."

¶ 23 On January 24, 2014, the jury convicted the defendant of aggravated vehicular hijacking and vehicular hijacking. On February 27, 2014, the defendant was sentenced to 15 years in the Illinois Department of Corrections for aggravated vehicular hijacking. On the same date, the defendant filed his notice of appeal.

ANALYSIS

We note that we have jurisdiction as the defendant perfected a timely notice of appeal. See Ill. S. Ct. R. 606(a), (b) (eff. Feb. 6, 2013).

The defendant raises two primary arguments on appeal. First, he argues that the State failed to prove his guilt of aggravated vehicular hijacking, because the State failed to prove that he *knew* that Carla was deaf at the time of the alleged crime. Thus, he urges that we reduce his conviction to the nonaggravated form of vehicular hijacking. Second, he argues that he was denied a fair trial and is entitled to a new trial because the prosecutor's commentary and conduct improperly sought to inflame the jury's passions and relied on facts that were not in evidence. Similarly, he argues that his trial counsel's failure to object to the same prosecutorial conduct constituted ineffective assistance of counsel, entitling him to a new trial.

We first address the defendant's argument that the State failed to prove the requisite mental state to convict him of aggravated vehicular hijacking. Generally, "[i]n resolving a challenge to the sufficiency of the evidence, a reviewing court must view all the evidence in the light most favorable to the prosecution and affirm the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Austin*, 349 Ill. App. 3d 766, 768 (2004).

However, as a threshold question of law, the parties in this appeal dispute whether, under the statutory provisions defining aggravated vehicular hijacking, the State was required to prove that the defendant had actual knowledge of Carla's deafness. Thus, we first discuss that issue. We note that we review questions of statutory interpretation *de novo. People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 12.

We first turn to the statutory provisions defining the nonaggravated and aggravated forms of the offense. Section 18-3 of the Criminal Code of 2012 (Code) provides that "A person commits vehicular hijacking when he or she *knowingly* takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-3 (West 2012). Section 18-4(a) sets forth a number of additional circumstances that will elevate the offense to aggravated vehicular hijacking. In this case, the defendant's conviction was premised upon section 18-4(a)(1), under which "A person commits aggravated vehicular hijacking when he or she violates Section 18-3; and (1) the person from whose immediate presence the motor vehicle is taken is a physically handicapped person or a person 60 years of age or over." 720 ILCS 5/18-4(a)(1) (West 2012).

The defendant argues that this subsection of the Code requires proof of actual knowledge of the victim's age or physical handicap to support the aggravated offense. He contends that the State had the burden to prove not only that he knowingly took Carla's vehicle but that he also *knew that Carla had a physical handicap* (deafness) in order to convict him of aggravated vehicular hijacking. He argues that the State's failure to prove this knowledge requires reduction of his conviction to nonaggravated vehicular hijacking.

The defendant does not cite any cases interpreting section 18-4(a)(1) of the Code which require the State to prove the defendant's actual knowledge of the victim's physical disability or age, to support an aggravated vehicular hijacking conviction. Instead, his argument relies largely on section 4-3 of the Code regarding "Mental State." 720 ILCS 5/4-3 (West 2012). Section 4-3(a) states: "A person is not guilty of an offense, other than an offense which

involves absolute liability,[1] unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in Sections 4-4 through 4-7" (describing "Intent," "Knowledge," "Recklessness," and "Negligence"). 720 ILCS 5/4-3(a) (West 2012).

¶ 32     Section 4-3(b) provides: "If the statute defining an offense prescribe[s] a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element. If the statute does not prescribe a particular mental state applicable to an element of an offense (other than an offense which involves absolute liability), any mental state defined in Sections 4-4 [intent], 4-5 [knowledge] or 4-6 [recklessness] is applicable." 720 ILCS 5/4-3(b) (West 2012).

¶ 33     Relying on these provisions, the defendant argues that "because the victim's physical handicap is an element of the offense, the State must prove beyond a reasonable doubt that when [the defendant] took the motor vehicle from [Carla] *** that he also knew or had reason to know that she was physically handicapped." In other words, he contends the State has the burden to prove not only that the defendant "knowingly t[ook] a motor vehicle *** by the use of force" under section 18-3 (720 ILCS 5/18-3 (West 2012)) but that a conviction for the aggravated form of the offense pursuant to section 18-4(a)(1) also requires the defendant to have *knowledge* that the victim "is a physically handicapped person or a person 60 years of age or over." 720 ILCS 5/18-4(a)(1) (West 2012).

¶ 34     The State disputes that section 18-4(a)(1) of the Code requires it to prove the defendant's knowledge of the victim's characteristics. The State emphasizes that section 18-4(a)(1) does not specify *any* mental state but provides only that "A person commits aggravated vehicular hijacking when he or she violates Section 18-3; and (1) the person from whose immediate presence the motor vehicle is taken is a physically handicapped person or a person 60 years of age or over." 720 ILCS 5/18-4(a)(1) (West 2012). That is, section 18-4 refers to section 18-3 and proceeds to list the additional circumstances justifying the aggravated form of the offense. However, section 18-4 does not specify whether the defendant must have knowledge of such circumstances.

¶ 35     The defendant suggests that section 18-4, in referring back to section 18-3 (which describes a "knowing" mental state for commission of the nonaggravated offense (720 ILCS 5/18-3 (West 2012)), necessitates application of the same mental state with respect to the circumstances that elevate the offense to aggravated vehicular hijacking. On the other hand, the State's position suggests that the legislature only intended for the term "knowingly" to apply to the *act* of taking a vehicle by force or threat of force, as set forth in section 18-3, and that the presence of additional circumstances listed in section 18-4 elevates the offense to the aggravated form, regardless of the defendant's knowledge of such additional circumstances.

¶ 36     The parties' briefs do not cite any case that has addressed this specific question in interpreting the aggravated vehicular hijacking statute. However, our research reveals case law discussing analogous questions. As set forth below, that precedent leads us to the conclusion

---

[1]Section 4-9 of the Code describes "Absolute liability." 720 ILCS 5/4-9 (West 2012) ("A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $1,000, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described.").

that although the "knowing" mental state requirement applies to the *act* of taking a vehicle by force, the State is not required to prove the defendant had knowledge of the victim's *characteristics* to support a conviction for aggravated vehicular hijacking under section 18-4(a)(1).

¶ 37        Although it concerned a different offense, we find the analysis by our court's Second District in *People v. Jasoni*, 2012 IL App (2d) 110217, is particularly instructive, as it faced an analogous question as to the defendant's knowledge of a victim's characteristics. In that case, the defendant was convicted of aggravated battery of a 68-year-old. *Id.* ¶ 4. The defendant conceded that he had committed a battery but argued he could not be convicted of *aggravated* battery, as there was insufficient evidence to prove that he knew the victim was over 60 years old. *Id.* ¶ 12.

¶ 38        The relevant subsection of the aggravated battery statute specified "that a person commits aggravated battery when, in committing a battery, the person '[k]nows the individual harmed to be an individual of 60 years of age or older.' " *Id.* ¶ 14 (quoting 720 ILCS 5/12-4(b)(10) (West 2008)). Significantly, the court in *Jasoni* noted that the statute had been amended: "Before 2006, a person committed aggravated battery if he '[k]nowingly and without legal justification and by any means cause[d] bodily harm to an individual of 60 years or older.' " *Id.* (quoting 720 ILCS 5/12-4(b)(10) (West 2004)).

¶ 39        The *Jasoni* court recognized that the "earlier version of the statute was interpreted to mean that, as long as the victim was 60 years of age or older and the defendant committed a battery, the defendant was guilty of aggravated battery." *Id.* (citing *People v. Jordan*, 102 Ill. App. 3d 1136 (1981)). That is, under the prior version of the aggravated battery statute, "the defendant's knowledge of the victim's age was irrelevant." *Id.* (citing *People v. White*, 241 Ill. App. 3d 291 (1993)).

¶ 40        *Jasoni* explained how the amended statutory language indicated an intent to require the defendant's knowledge of the victim's age:

> "In the previous version of the statute, the adverb 'knowingly' was located before the verb 'causes' and therefore modified 'causes bodily harm.' However, in the current version of the statute, the word 'knows' comes directly before the phrase 'the individual battered to be a person 60 years of age or older.' It is therefore clear that the word 'knows' refers to the individual's age." *Id.* ¶ 16.

¶ 41        Citing the principle that a statutory amendment "is presumed to have some purpose" to change the law, the court "presume[d] that the legislature intended to change the law of aggravated battery" and to "depart from the previous interpretation, as set forth in *White* and *Jordan*" that the defendant was not required to have knowledge of the victim's age. *Id.* ¶¶ 17-18. The *Jasoni* court concluded that "the plain language of the statute makes clear that the General Assembly intended that a defendant know that the person he or she battered was 60 years of age or older before a conviction of aggravated battery could stand." *Id.* ¶ 18.

¶ 42        The analysis of the statutory language at issue in *Jasoni* is instructive in reviewing the aggravated vehicular hijacking statutory provisions in this case. However, as we find that the applicable statutory language in this case is plainly distinguishable from the aggravated battery statute discussed in *Jasoni*, we reach a different result. That is, we do *not* interpret section 18-4 of the Code to require the State to prove the defendant's knowledge of the additional circumstances, such as the victim's age or disability, that transform vehicular hijacking under section 18-3 to the aggravated form of the offense.

¶ 43    *Jasoni* illustrates the importance of the legislature's use and placement of the term "knows" or "knowingly." In *Jasoni*, the court emphasized that in the amended battery statute, "the word 'knows' comes directly before the phrase 'the individual battered to be a person 60 years of age or older.' " *Id.* ¶ 16. This indicated the legislative intent to require proof of the defendant's knowledge of the victim's age. *Id.* ¶ 18.

¶ 44    The statutory language at issue here is quite different. In section 18-3, describing the nonaggravated crime of vehicular hijacking, the adverb "knowingly" appears immediately before the phrase "takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3 (West 2012). However, section 18-4, in describing the aggravated form of the offense, does not use the term "knowingly" *or any mental state language whatsoever*. Rather it specifies that a person commits aggravated vehicular hijacking "when he or she violates Section 18-3" and there are additional circumstances, such as the victim's status as "a physically handicapped person." 720 ILCS 5/18-4 (West 2012). The statute does not assign any mental state to these aggravating circumstances.

¶ 45    As demonstrated by *Jasoni* and the statutory amendment described therein, the legislature easily *could have* amended the aggravated vehicular hijacking statute to clarify a knowledge requirement. Just as the legislature amended the aggravated battery statute to specify that the offense occurs when the defendant " '[k]nows the individual harmed to be *** 60 years of age or older' " (*Jasoni*, 2012 IL App (2d) 110217, ¶ 16 (quoting 720 ILCS 5/12-4(b)(10) (West 2008)), the General Assembly could have amended section 18-4 to state that a person commits aggravated vehicular hijacking when he or she violates section 18-3 *and he or she knows that* the person from whom the vehicle is taken is physically handicapped or over 60 years of age. However, the legislature has elected not to do so.

¶ 46    Absent such amendment, the wording of the aggravated vehicular hijacking statute in section 18-4 is more similar to the *earlier* form of the aggravated battery statute discussed in *Jasoni*, defining the offense where one " '[k]nowingly *** cause[d] bodily harm to an individual of 60 years of age or older.' " *Id.* ¶ 14 (quoting 720 ILCS 5/12-4(b)(10) (West 2004)). As noted in *Jasoni,* our court had interpreted that language to mean "that it was *not* necessary to show that a defendant knew he or she was committing battery on someone 60 years of age or older." (Emphasis added.) *Id.* ¶¶ 14-15.

¶ 47    Considering that (1) section 18-3 specifies a "knowing" mental state *only to the act* of taking a motor vehicle by force or threat of force, (2) section 18-4 does not specify *any* mental state as to the additional circumstances that elevate the offense to its aggravated form, and (3) the legislature has *not* seen fit to amend the aggravated vehicular hijacking statute (as it did the aggravated battery statute) to clarify any such knowledge requirement, we do not interpret section 18-4(a)(1) as requiring the State to prove that the defendant knew that his victim was physically handicapped or over 60 years of age. Rather, upon commission of the ordinary form of the offense under section 18-3, the presence of the additional circumstances set forth in section 18-4 proves the aggravated form of the offense, regardless of the defendant's knowledge of aggravating circumstances.

¶ 48    We also find support for our reading from firearm possession cases where our court has held that, although the State must prove knowing possession of the weapon, the State does not need to prove the defendant's knowledge of the firearm's characteristics. See *People v. Ivy*, 133 Ill. App. 3d 647, 652 (1985) (the State did not need to prove defendant's knowledge of the

character of the firearm to support conviction under a statute providing that " 'A person commits the offense of unlawful use of weapons when he knowingly: *** Sells, manufactures, purchases, possesses or carries *** any shotgun having one or more barrels less than 18 inches in length, sometimes called a sawed-off shotgun ***.' " (quoting Ill. Rev. Stat. 1981, ch. 38, ¶ 24-1(a)(7))); *People v. Wright*, 140 Ill. App. 3d 576, 583 (1986) (finding that the statute "does not require that defendant in fact know [that] the shotgun's barrel measured less than 18 inches").

¶ 49    We also find the analysis in *People v. Stanley*, 397 Ill App. 3d 598 (2009), to be analogous. The *Stanley* defendant was convicted of violating a statute prohibiting possession of " 'any firearm upon which any *** manufacturer's serial number has been changed, altered, removed or obliterated.' " *Id.* at 605 (quoting 720 ILCS 5/24-5(b) (West 2006)). On appeal, the defendant argued that the evidence was insufficient to demonstrate that he had knowledge of the defacement of the firearms at issue. *Id.* at 603.

¶ 50    The *Stanley* court, after reviewing the mental state provisions of section 4-3 of the Code, found that although the State must prove knowledge of the *act of possession*, the State need not prove the defendant's knowledge of the defaced character of the gun. *Id.* at 607. The *Stanley* court cited our court's holdings in *Ivy* and *Wright* regarding a defendant's knowledge of the nature of a sawed-off shotgun, as well as a Supreme Court of New Jersey decision interpreting a similar defaced firearms statute and holding that " 'The State was not required to prove that, at the time that he knowingly possessed the firearm, defendant also knew that it was defaced.' " *Id.* at 607-08 (quoting *State v. Smith*, 963 A.2d 281, 289 (N.J. 2009)).

¶ 51    In holding that the State did not need to prove knowledge of the nature of the firearm, our court in *Stanley* addressed its arguable inconsistency with section 4-3(b) of the Code—which the defendant heavily relies upon in this appeal—as follows:

"We recognize that it could be contended that there is an inconsistency between our holding and the language of section 4-3(b) of the Code. However, we find that no such inconsistency exists. Section 4-3(b) provides, in part: 'If the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each such element. [Citation.] While this could arguably be read to require proof defendant knew of the nature of the defaced firearm, we find that this is not, in fact, the case. Instead, we discern that the elements of this offense are properly the *mens rea* and the possession, that is, the State must prove the knowing possession of the defaced firearm by defendant. *The State, however, need not prove knowledge of the character of the firearm.* Though the defacement unmistakably bears upon the commission of the offense, it is not an element of the offense." (Emphasis added.) *Id.* at 609.

¶ 52    *Stanley*'s analysis, which differentiated between knowledge of the *act* of gun possession from knowledge of the character of the gun, is analogous to the situation here. We distinguish the knowledge of the act of taking a motor vehicle by force from the defendant's knowledge of other circumstances, such as the victim's age or disability. To support a conviction for aggravated vehicular hijacking in this case, the State only had to prove that the defendant knowingly took the motor vehicle by force or threat of force and that Carla was a "physically handicapped person." 720 ILCS 5/18-4(a)(1) (West 2012). That is, the State was not required to prove the defendant's *knowledge* of Carla's deafness to support the aggravated form of the offense under section 18-4(a)(1). Again, we note that had the legislature intended to impose

such a knowledge requirement, it could easily have done so by amending section 18-4 to specify a mental state for the circumstances elevating the offense to its aggravated form.

¶ 53    As we conclude that the State was not required to show the defendant's actual knowledge of Carla's deafness, we need not address the parties' arguments as to whether the evidence presented at trial could support a finding of such knowledge. Accordingly we reject the defendant's arguments based upon the sufficiency of the evidence.

¶ 54    We now turn to the defendant's contention that the prosecutor's conduct deprived him of a fair trial, entitling him to a new trial. As set forth below, although we find that certain commentary by the prosecutor was improper, we do not find that such conduct amounted to reversible error.

¶ 55    In particular, the defendant claims that the prosecutor inflamed the jury's passion by attempting to evoke sympathy for the victim, Carla, and by arguing facts that were not in evidence. The defendant cites six specific instances of alleged misconduct: (1) the prosecutor's opening statement, in which the prosecutor told the jury that Carla could no longer drive to school and "Her dad has to drive her"; (2) the prosecutor's question to Carla on direct examination as to whether she drove to school, eliciting testimony that she still did not have a car; (3) the prosecutor's question asking Carla how she felt about not having a car, eliciting her testimony that it is "really sad for me"; (4) the prosecutor's statements in closing argument that Carla still does not have a car because she cannot afford one and that she relies on her father to drive her to school; (5) the prosecutor's subsequent statement during closing argument that it is "an injustice" that Carla still does not have a car and must rely on her father; and (6) the prosecutor's statement in rebuttal argument emphasizing that Carla "got very emotional when talking about how she didn't have a car anymore."

¶ 56    The defendant acknowledges that his trial counsel did not object to any of the prosecutorial statements challenged on appeal. Thus, those objections were forfeited. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (Both a trial objection and a written posttrial motion raising the issue are required to preserve errors that could have been raised during trial.). Nonetheless, he urges that we should review the prosecutor's conduct under the "plain error" doctrine.

¶ 57    "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. [Citation.]" *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in the plain-error analysis is to determine whether an error occurred. See *id.*

¶ 58    As set forth below, although we find that the prosecutor made certain improper comments, we do not find any clear error that warrants reversal. Our precedent makes clear that, although it is generally improper for a prosecutor to seek to inflame the jury's emotions or refer to facts not in evidence, such conduct constitutes reversible error only if it can be considered a material factor in the defendant's conviction. We cannot say that is the case here.

¶ 59    "While the State has wide latitude in making opening statements and closing arguments and is entitled to comment on the evidence [citation], comments intending only to arouse the prejudice and passion of the jury are improper [citation]." *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21. "[T]he purpose of an opening statement is 'to advise the jury concerning the question of facts and it is not, and should not be permitted to become an argument.' [Citation.]

- 10 -

Moreover, the statement should be \*\*\* 'free from material that may tend to improperly prejudice the accused in the eyes of the jury.' [Citation.] In other words, remarks that may be appropriate for closing arguments may not be appropriate for opening statements." *Id.* ¶ 22. "In any event, comments that [exceed] the bounds of proper argument require reversal [citation], only if the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them [citation]." (Internal quotation marks omitted.) *Id.* ¶ 23.

¶ 60    Similar principles apply to our review of closing arguments. "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue [that] this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). "Closing argument must serve a purpose beyond inflaming the emotions of the jury. [Citations.] A prosecutor cannot use closing argument simply to 'inflame the passions or develop the prejudices of the jury without throwing any light upon the issues.' [Citation.]" *Id.* at 128-29. Nonetheless, a "substantial prejudice" inquiry applies to determine if there is reversible error:

"In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. [Citation.] Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. [Citation.]" *Id.* at 123.

¶ 61    In other words, "[w]hile a prosecutor may not make arguments or assumptions that have no basis in evidence, even improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. [Citation.]" *People v. Smith*, 362 Ill. App. 3d 1062, 1085 (2005). In this case, although certain of the prosecutor's comments were improper, we do not find that they were so prejudicial as to require reversal.

¶ 62    It is apparent that the prosecutor sought to evoke sympathy by eliciting testimony about, and commenting on, the fact that Carla still did not have a car at the time of trial, that she wanted a car to drive to school, and that not having a car made her feel "sad." Clearly, such testimony was not relevant to the determination of whether the defendant perpetrated the crime.

¶ 63    Moreover, the prosecutor's comments suggesting that Carla's stolen vehicle was "new," that Carla could not afford to buy another car, and that she relied on her father for transportation did not reflect the evidence presented. Carla simply did not testify to those facts; even if she had, such testimony would have been irrelevant to the question of the defendant's guilt or innocence. Again, it appears that the prosecutor made such statements to engender sympathy for Carla and to encourage the jury to punish the defendant for the crime's impact on Carla.

¶ 64    Nevertheless, we cannot say that the remarks here, individually or cumulatively, were so prejudicial that they were a material factor in the defendant's conviction. Although the State attempted to engender sympathy for Carla, we have no reason to believe that the verdict was based on improper commentary. This is particularly the case in light of the ample, if not overwhelming, additional evidence that supported a finding of the defendant's guilt.

Regardless of any sympathy for Carla, the jury could and apparently did believe her trial testimony that she recognized the defendant as the man who had threatened her and then demanded her car. The jury could and also did credit the testimony from Detective Shefcik that, shortly after the incident, Carla had identified the defendant in a photographic array and later identified him again in a physical lineup.

¶ 65    The jury could and also did credit the testimony from both Officer Heberger and Officer Connolly that they recognized the defendant as one of the individuals who fled from the stolen vehicle on March 2, 2011. The jury was certainly entitled to believe those officers' testimony instead of the conflicting testimony of the defendant's friend, Robinson.

¶ 66    Given the evidence of the defendant's guilt, we do not believe that the prosecutor's appeals to arouse sympathy for Carla constituted "a material factor in the conviction or cause[d] substantial prejudice to" the defendant. *Smith*, 362 Ill. App. 3d at 1085. In other words, even had the prosecutor *not* made the complained-of comments or elicited irrelevant testimony about Carla's sadness over the loss of her car, the jury could quite readily have reached the same verdict on the relevant evidence presented by the State. As we cannot say that the complained-of conduct constituted a material factor in the defendant's conviction, we do not find that the prosecutor's conduct constituted reversible error warranting a new trial.

¶ 67    As we do not find that the prosecutor's conduct constituted reversible error, we need not separately discuss, under the plain-error doctrine, whether the evidence was closely balanced, or if the error was so serious that it affected the fairness of the trial or challenged the integrity of the judicial process. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 68    Finally, we reject the defendant's ineffective assistance of counsel argument. He contends that, had his trial counsel objected to the prosecutor's conduct "there is a reasonable probability that the court would have *** excluded the inflammatory testimony and comments, and that the outcome of the trial would have been different." We disagree for the reasons discussed.

¶ 69    A successful claim of ineffective assistance of counsel requires a defendant to "show that counsel's performance was deficient and that the deficient performance prejudiced the defendant such that he was deprived of a fair trial. [Citations.] To establish prejudice, the defendant must show a reasonable probability that, absent counsel's alleged error, the trial's outcome would have been different." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 14. If a defendant fails to establish either deficient performance by counsel or resulting prejudice, the ineffective assistance claim fails. *Id.*

¶ 70    As we have explained, the alleged prosecutorial misconduct was not reversible error, as the challenged comments and testimony were not a material factor in the conviction, given the ample evidence of the defendant's guilt. In turn, the defendant cannot establish that his counsel's failure to object to the prosecutor's conduct caused him any prejudice. Accordingly, we reject his ineffective assistance of counsel claim.

¶ 71    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 72    Affirmed.