2020 IL App (1st) 161818-U

THIRD DIVISION
March 25, 2020

No. 1-16-1818

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 21903 |
| | ) | |
| EVERETT HARRIS, | ) | Honorable |
| | ) | James N. Karahalios, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; the State proved defendant guilty of aggravated vehicular hijacking where the evidence was sufficient to prove beyond a reasonable doubt that defendant took the victim's vehicle from his immediate presence by force where defendant forced victim to flee from his vehicle by shooting him in connection with a confrontation between the victim of the vehicular hijacking and a second shooting victim; we remand for defendant to file a motion pursuant to Illinois Supreme Court Rule 472(e) to correct the mittimus.

¶ 2    The State charged defendant, Everett Harris, with multiple counts of attempt (first degree murder), aggravated kidnapping, and aggravated battery with a firearm, and single counts of aggravated discharge of a firearm and aggravated vehicular hijacking.  Following trial, a jury found defendant guilty of  two counts of attempt (first degree murder), two counts of aggravated

battery with a firearm, two counts of aggravated kidnapping, one count of aggravated discharge of a firearm, and one count of aggravated vehicular hijacking. The trial court merged defendant's convictions for aggravated battery with a firearm with the convictions for attempt (first degree murder) and sentenced defendant to an aggregate of 98 years' imprisonment. Defendant appeals, arguing the State failed to prove him guilty beyond a reasonable doubt of aggravated vehicular hijacking, he is entitled to a new trial based on improper comments during the State's closing argument, and the mittimus improperly reflects convictions for two counts of aggravated battery with a firearm.

¶ 3    For the following reasons, we affirm the trial court's judgment and remand for further proceedings.

¶ 4                                          BACKGROUND

¶ 5    The material facts are not in dispute. In November 2013 defendant and Samantha Santos had known each other for over ten years and had an "on-again, off-again" romantic relationship. Santos is the mother of two children born in 2008 and 2010, respectively. Defendant is not the children's biological father but he has known them their entire lives. Santos listed defendant on school and medical paperwork so that defendant could pick the children up from school and take them to medical appointments when Santos asked defendant to do those things. On November 13, 2014, defendant's and Santos's romantic relationship was "off." At approximately 8:00 a.m. that morning defendant called Santos and asked her for a ride to a laundromat. Santos agreed. When Santos met defendant her two children were in the backseat of her car. Santos planned to take her children to a doctor's appointment after dropping off defendant. Defendant got into the front seat of Santos's car with a bag of laundry and laundry soap.

¶ 6     Defendant tried to talk to Santos about their relationship but Santos told defendant she did not want to talk about it.  At one point, defendant reached over and put the car in park, took the keys from the ignition, and got out.  Defendant went around to the driver's side of the vehicle, got in and pushed Santos to the passenger's side, and drove off.  Defendant demanded Santos's phone "to go through it" and she gave it to him.  Defendant threw the phone back to Santos and, she testified, defendant stated "I'm going to show you I'm crazy today."

¶ 7     Santos thought defendant was going to fight with her and she did not want to fight with defendant in front of her children.  When defendant stopped at a light, Santos testified she knew that a nearby liquor store usually had a Chicago Police Department officer stationed inside, so she got out of the vehicle hoping defendant would follow her so she could lead him into the liquor store where she thought a police officer might be located who could prevent a fight.  However, when Santos exited the vehicle defendant did not follow her.  Instead, he drove off with the children still in Santos's car.  Santos testified defendant did not have permission to drive away with her children at that time.

¶ 8     Santos went into the liquor store but no officer was present.  Santos called police, which responded and spoke to her near the liquor store.  Defendant called Santos but Santos hung up on him.  The officer who responded to Santos's call testified that his report indicates that Santos told him that defendant punched Santos several times with a closed fist.  The officer testified he did not see any injuries to Santos.  At defendant's trial, Santos testified she did not tell police that defendant punched her.  The police officer drove Santos around the area looking for her vehicle and defendant but they did not find them so the officer drove Santos home.  From the time Santos called police until she arrived back home defendant called Santos several times and at times they spoke to each other.  Defendant never told Santos where he was with the children.

Santos lived in an apartment in her parents' building where her parents also lived. Once she was back home, Santos's parents came to her apartment, along with Santos's father's cousin Efrain Tirado, her father's friend Michael Marts, defendant's mother whom Santos had called earlier from the liquor store, and two other friends of Santos's.

¶ 9    While at Santos's apartment one of Santos's friends answered another phone call from defendant. During that call defendant mentioned the store KB Toys. Santos and Tirado left with the two friends in Tirado's van to go to a nearby shopping mall to look for defendant. Marts and Santos's father separately went to the same mall together to look for defendant. Marts and Santos's father drove around the mall parking lot and looked inside the mall but were unable to locate defendant or Santos's vehicle. Tirado also testified they drove around the parking lot but were unable to locate Santos's vehicle. Santos testified she and Tirado never made it to the first mall before she learned Marts and her father were unable to locate defendant. Santos received another call from defendant during which she spoke to one of her children who said they were at the mall, so Santos decided to go to another mall in the area. On their way to the second mall, Santos and Tirado saw Samantha Santos's vehicle and followed it to the second mall and into the parking lot. Santos's father testified he received a phone call after which he and Marts drove to the second mall.

¶ 10    Once defendant parked Santos's car in the parking lot at the second mall, Tirado parked his van in a manner to block Santos's car from leaving. Marts had also arrived at the second mall and parked his vehicle in front of and perpendicular to Santos's car. Santos exited Tirado's van taking a hammer Tirado had in the van with her. Defendant opened the driver's side door and Santos swung the hammer at defendant before he could exit the vehicle. Santos may have struck defendant one or two times. Tirado joined Santos at the driver's side of the car, pushed

her out of the way, and tried to remove defendant from the vehicle. Santos fell to the ground.

Defendant retrieved a handgun and fired, striking Tirado. Tirado yelled for Santos to run and he

ran into the mall. Santos went around to the other side of the vehicle. Her children were still in

the backseat. At that point, Santos saw Marts at the front of the vehicle. Santos went to Marts

and tried to push him out of the way, and they both fell to the ground in front of Santos's car.

Defendant had exited the vehicle and stood over Santos and Marts. Defendant was kicking both

Santos and Marts. Defendant's gun had jammed and Marts testified defendant was trying to

unjam the gun. Defendant eventually pointed the gun down toward them and fired several more

times, striking Santos multiple times.

¶ 11    Tirado was returning to the vehicles when he saw defendant shoot at Santos and Marts.

Tirado then saw defendant get into Tirado's van and drive away. Tirado left the keys in the

ignition with the engine running, and he testified that he was six to seven parked cars away when

defendant drove off in his van.

¶ 12    After a vehicle chase, police stopped Tirado's van and apprehended defendant. Police

recovered the gun used to shoot Tirado and Santos from Tirado's van.

¶ 13    During deliberations, the jury asked for a transcript of Santos's testimony, which it

received. Later the jury asked for a definition of "immediate presence" for purposes of

aggravated vehicular hijacking[1] and whether Tirado's vehicle had to have been taken from

Tirado or could have been taken from anyone. The parties agreed and the trial court instructed

the jury that "immediate presence" meant "immediate vicinity" and that the vehicle had to have

---

[1]    "A person commits vehicular hijacking when he or she knowingly takes a motor vehicle from the person *or the immediate presence of another* by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-3(a) (West 2018).

been taken from Tirado.  After approximately nine hours of deliberations the court excused the jury for a long weekend.  The jury returned the following Tuesday and continued deliberating. The jury asked for a transcript of the entire trial.  The court informed the jury the transcript could not be ready until the following day and asked the jury if it wanted a particular witness's testimony.  The jury responded with a note that it was deadlocked.  The court ordered the jury to continue deliberating.  The jury later asked for transcripts of specific testimony which the court informed the jury could be available the following morning.  The jury later sent a note stating it was deadlocked and the transcripts would not help.  The court discussed sending the jury home so that it could return the following morning and have the transcripts.  The State objected and asked for a *Prim* instruction to which the trial court agreed and gave the jury Illinois Pattern Jury Instructions, Criminal, No. 26.07 (4th ed. 2000).[2]  Later that night the jury returned its verdict finding defendant not guilty of the attempt (first degree murder) of Marts, guilty of attempt (first degree murder) of Tirado and Santos, guilty of aggravated battery with a firearm of Tirado and Santos, guilty of aggravated kidnapping of Santos's two children, guilty of aggravated discharge of a firearm, and guilty of aggravated vehicular hijacking.

¶ 14    Defendant filed a motion for a new trial, which the trial court denied.  After a sentencing hearing the trial court merged the two counts of aggravated battery with a firearm of Tirado and Santos with the two counts of attempt (first degree murder) of Tirado and Santos and sentenced defendant to an aggregate term of 98 years' imprisonment in the Illinois Department of Corrections.

---

[2]    Illinois Pattern Jury Instruction 26.07 is taken from *People v. Prim*, 53 Ill. 2d 62 (1972) and directs the jury to "continue its deliberation even though the jury has reported that it is deadlocked and will be unable to reach a verdict." *People v. Cowan*, 105 Ill. 2d 324, 328 (1985).

¶ 15    This appeal followed.

¶ 16                                    ANALYSIS

¶ 17    Defendant raises three arguments on appeal.  First, defendant argues the State failed to prove him guilty beyond a reasonable doubt of aggravated vehicular hijacking because the evidence failed to establish that defendant (a) took Tirado's vehicle from his immediate presence and (b) the "force" defendant used during the incident was separate from the taking of the vehicle.  Next, defendant argues he was deprived of his right to a fair trial by the State's closing argument in which the State (a) made an explicit appeal to the jurors' emotions that had nothing to do with the questions of fact before the jury and (b) suggested defendant committed prior bad acts that were not in evidence.  Finally, defendant argues the mittimus erroneously does not conform to the trial court's oral pronouncement that the counts for aggravated battery with a firearm to Tirado and Santos merge into the counts for the attempt (first degree murder) of Tirado and Santos.  For the following reasons, we affirm defendant's conviction for aggravated vehicular hijacking, hold the State's closing argument did not deprive defendant of a fair trial, and remand for defendant to file a motion pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019) to correct the mittimus.

¶ 18          (a) Sufficiency of the Evidence to Prove Aggravated Vehicular Hijacking

¶ 19    Defendant appeals his conviction for aggravated vehicular hijacking of Tirado's van based on the alleged insufficiency of the evidence to prove every element of the offense beyond a reasonable doubt.  "Generally, [i]n resolving a challenge to the sufficiency of the evidence, a reviewing court must view all the evidence in the light most favorable to the prosecution and affirm the conviction if any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Harris*, 2017 IL App (1st) 140777, ¶ 27.

> "A person commits aggravated vehicular hijacking when he or she ['knowingly takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force' (720 ILCS 5/18-3 (West 2018)]; and
>
> * * *
>
> (4) he or she carries on or about his or her person or is otherwise armed with a firearm; or
>
> (5) he or she, during the commission of the offense, personally discharges a firearm." 720 ILCS 5/18-4 (West 2018).

¶ 20    Defendant argues the evidence established that Tirado was at least 25 feet away from his vehicle when defendant took it and that distance is insufficient to constitute taking the vehicle from Tirado's "immediate presence" within the meaning of the vehicular hijacking statute. Defendant also argues that the taking of the van was unrelated to the force used against Tirado and Santos and, therefore, he did not take the van by force. Defendant asks this court to review the sufficiency of the evidence to establish these elements of the offense *de novo* because the facts are not in dispute and his guilt is therefore a question of law.

¶ 21    In *People v. Robinson*, 383 Ill. App. 3d 1065, 1068 (2008), the defendant argued "there was no evidence that [the victim] was in the 'immediate presence' of her car at the time it was forcibly taken from her." This court wrote that "[i]n considering a respondent's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the respondent

guilty beyond a reasonable doubt. [Citation.] However, where the facts are not in dispute, a defendant's guilt is a question of law, which is reviewed *de novo. People v. Smith,* 191 Ill. 2d 408, 411 (2000)." *Id.* In *Smith*, although our supreme court found in that case that "[b]ecause the facts are not in dispute, [the] defendant's guilt is a question of law, which we review *de novo*," (*Smith*, 191 Ill. 2d at 411), the actual issue in *Smith* was the legal "meaning of the phrase 'otherwise armed' as used in the armed violence statute." See *Smith*, 191 Ill. 2d at 411-12. The *Smith* court held that phrase in that statute meant "immediate access to or timely control over a weapon" or "the intent and capability to maintain control and possession of the weapon." (Internal quotation marks omitted.) *Id.* at 412.

¶ 22    In this case, we decline to apply a *de novo* standard of review to the question of the sufficiency of the evidence to prove defendant's guilt of aggravated vehicular hijacking beyond a reasonable doubt. Rather, we adhere to the well-established rule that "[w]hen a defendant argues the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *People v. Reed*, 2018 IL App (1st) 160609, ¶ 37. Nonetheless, to the extent defendant's argument "is actually one of statutory interpretation" with regard to the meaning of "immediate presence" we will apply the rule that "[i]n matters of statutory interpretation our standard of review is *de novo*." *People v. Koen*, 2014 IL App (1st) 113082, ¶ 30. "The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature. [Citation.] We construe the statute as a whole and afford the language its plain and ordinary meaning. [Citation.]" *Id.*

¶ 23    Informative of the legislative intent behind the phrase "immediate presence" in the vehicular hijacking statute is the decision in *People v. Cooksey*, 309 Ill. App. 3d 839 (1999), the

applicability of which the parties dispute. In *Cooksey* the defendant accosted the victim as she was exiting a mall with deposits including cash and checks from the store where she worked. *Cooksey*, 309 Ill. App. 3d at 842. The victim dropped her deposit bag and ran, and the defendant chased her. *Id.* When the defendant caught up to the victim, he demanded her car keys. *Id.* The victim handed over her keys and the defendant pushed her and told her to run. *Id.* The victim ran back into the mall. *Id.* She returned to the parking lot to discover her car missing. *Id.* At issue in *Cooksey* was the meaning of the term "immediate presence" in the vehicular hijacking statute and whether the evidence proved that element of the offense. See *id.* at 846-47. In that case this court found the "undisputed evidence in the present case showed that at no time did the victim approach her car. Rather, the victim was directly outside the entrance to the mall and standing 25 feet away from her car when defendant jumped in front of her. She was not even attempting to gain entry to her car. Moreover, it is clear that, when she originally fled, she did not flee to her car." *Id.* at 848.

¶ 24    Because there had "been no Illinois cases dealing with the interpretation of the term 'immediate presence' " this court turned to the legislative debates on the enactment of the statute. *Id.* at 847. The court found as follows:

> "A reading of the debates in the legislature demonstrates that the
> legislature believed that 'immediate presence' was
>
>> 'the same language that we have in terms of robbery, I
>> think, and you could be, I suppose repairing your car, or changing
>> a tire, or at the gas pump and-and filling it up and still this offense
>> would still take place. No, you couldn't be in the store away from

the car at the time.'  88th Ill. Gen. Assem., Senate Proceedings,

April 15, 1993, at 283 (statements of Senator Hawkinson).

Based on the comments of the sponsor of the bill to enact the vehicular

hijacking statute, it is clear that the vehicular hijacking statute was enacted to

combat the 'tragedies *** of car hijacking where someone armed or unarmed

attacks a car, and either snatches the driver out *** [or] sometimes these

carjackings occur where a young child is a passenger in the car and is taken for a

ride after a mother or father is-is yanked from the car.'  88th Ill. Gen. Assem.,

Senate Proceedings, April 15, 1993, at 281 (statements of Senator Hawkinson).

* * *

The debates in the legislature make it clear that the legislature intended the

statute to protect against the forceful taking of cars from a driver or passenger

while that driver or passenger is in the immediate vicinity of the car.  As stated by

Senator Hawkinson, there would be no vehicular hijacking if the victim was 'in

the store away from the car at the time.'  88th Ill. Gen. Assem., Senate

Proceedings, April 15, 1993, at 283 (statements of Senator Hawkinson).

* * *

The intent of the legislature was to create a new offense when someone forcibly

removes someone from their car, or otherwise forcibly dispossesses someone of

their car."  *Id.* at 847-48.

¶ 25    Based on its reading of the legislative intent behind the statute the majority in *Cooksey*

found the evidence "failed to show that the defendant took the victim's car from her immediate

presence" and reversed the defendant's conviction for vehicular hijacking.  *Id.* at 848, see also

*Robinson*, 383 Ill. App. 3d at 1071 (holding State failed to prove the defendant guilty beyond a reasonable doubt of aggravated vehicular hijacking where there was no evidence the victim was in the immediate vicinity of the car or that the vehicle was within the immediate control of the victim at the time of the occurrence, nor that the car was near or at hand to the victim (citing *People v. McGee*, 326 Ill. App. 3d 165, 170 (2001), *In re Ricardo A.*, 356 Ill. App. 3d 980, 991-92 (2005)). The dissenting justice in *Cooksey* found that "the immediate presence requirement is satisfied if at the time of the taking, the motor vehicle is in close proximity to the victim." *Cooksey*, 309 Ill. App. 3d at 853 (McBride, J., dissenting). The dissent also concluded that "the statutory language does not require the victim to be physically next to the vehicle at the time of the taking," which the dissent opined "is what the majority decision holds." *Id.* The dissent concluded instead that "close proximity is a measure to be determined by the jury as a question of fact. Thus, if immediate presence includes an area in close proximity to the victim, a jury could easily have concluded that the vehicle in this case was taken from the victim's immediate presence." *Id.*

¶ 26 In this case, defendant argues Tirado was further away from his vehicle than the victim in *Cooksey* and at least as far away as the victim in *Robinson* when their vehicles were taken (and not as close to the vehicle as the victim in *Ricardo A.*, in which this court affirmed the defendant's conviction for aggravated vehicular hijacking), therefore this court should find the evidence failed to establish he took the vehicle from Tirado's immediate presence. The State responds, in part[3], that defendant's argument is flawed because "neither *Ricardo A.*, nor

---

[3] The State also refutes the admissibility of defendant's "evidence" of the distance, which is based on Tirado's testimony he was six to seven parked cars away from his van when it was taken and published standards for parking space sizes. As will be evident from our disposition of this issue we have no need to address the State's concern about this evidence because the precise

*Cooksey*, *McGee*, or *Robinson* relied upon distance alone to determine whether the immediate presence element had been satisfied.  Rather, the courts in those cases considered the totality of the circumstances when reviewing whether the victims were in the immediate presence of their vehicles when the vehicles were taken."  (Emphases omitted.)  Defendant in reply argues that relying on distance alone to determine whether the immediate presence element was proven is "precisely what these cases did."

¶ 27     We agree with the State that a numerical assessment of distance alone is not the determining factor of whether a victim is in the "immediate presence" of his or her vehicle for purposes of the vehicular hijacking statute.  The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, the best indication of which is the plain and ordinary meaning of the statutory language.  *People v. Comage*, 241 Ill. 2d 139, 144 (2011).  The dictionary may be used to ascertain the plain and ordinary meaning of statutory language.  *Id.* As this court noted in *Ricardo A.*, " 'Immediate' means 'being near at hand: not far apart or distant.'  Webster's Third New International Dictionary 1129 (1993)."  *In re Ricardo A.*, 356 Ill. App. 3d at 992, overruled on other grounds by *In re Samantha V.*, 234 Ill. 2d 359 (2009).  The statutory language does not contain a discrete distance one must be within to be the victim of a vehicular hijacking.  Given the definition of "immediate" quoted above, we must find that the plain and ordinary meaning of "immediate" for purposes of the phrase "immediate presence" in the statute does not rely on a precise measure of distance.  Nor do we find that the authorities

---

distance Tirado was from the vehicle would not alter our disposition in this case and, even accepting defendant's estimation of the distance, his argument fails.  See *People v. White*, 2011 IL 109689, ¶ 144  ("courts of review should not ordinarily consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided").

upon which defendant relies relied on a measure of distance alone to determine whether this element of the offense was proven.

¶ 28    The *McGee* court "conclude[d] that 'immediate presence,' as the term applies to vehicular hijacking, means that the vehicle is within the immediate control of the alleged victim at the time of the occurrence." *McGee*, 326 Ill. App. 3d at 170. Whether an owner of a vehicle can be said to be in "immediate control" of their vehicle is not a measure of distance but a combination of factors, only one of which is physical proximity, including other indices of "control" of the vehicle. Similarly, returning to the majority holding in *Cooksey*, we do not believe it *only* requires the victim to be physically next to the vehicle at the time of the taking. In other words, the court did not find simply that a distance of 25 feet was insufficient to establish that the victim was in the immediate presence of her vehicle when it was taken. Our current reading of *Cooksey*, illuminated by its subsequent application, is more expansive.

¶ 29    First, we note the majority's holding in *Cooksey* that "[t]he debates in the legislature make clear that the legislature intended the statute to protect against the forceful taking of cars *from a driver or passenger* while that *driver or passenger* is in the immediate vicinity of the car." (Emphases added.) *Cooksey*, 309 Ill. App. 3d at 848. Viewed this way the question under *Cooksey* becomes, at least in part, when, for purposes of vehicular hijacking, a person is a driver or passenger. We can infer from Senator Hawkinson's comments that one who parks his or her car and enters a store is no longer a driver or passenger of the car (see *id.*, citing 88th Ill. Gen. Assem., Senate Proceedings, April 15, 1993, at 283 (statements of Senator Hawkinson)), and Senator Hawkinson tells us directly that such person is not in the "immediate presence" of the vehicle. Nor would be, this court has determined, one who parks in a parking lot and goes to work and does not approach the car before the mechanism of its taking occurs (*Cooksey*, 309 Ill.

App. 3d at 848); nor one who parks their car at home and later goes for a walk, even if while taking that walk the car is some reasonable distance nearby but there is no evidence of going to or exercising control of the car before the taking (see *Robinson*, 383 Ill. App. 3d at 1070-71)); nor one who drives to a residence, parks, and enters the residence staying inside (in that case, due to being physically and sexually assaulted) (see *McGee*, 326 Ill. App. 3d at 167, 170). On the contrary, one who stops his vehicle and steps out with keys in hand to briefly speak to another could still be considered to be a "driver" of the vehicle and in its "immediate presence" even when forced to walk a short distance away. See *Ricardo A.*, 356 Ill. App. 3 at 983.

¶ 30    Based on our reading of the authorities, we believe the better inquiry is whether the victim was *using* the vehicle at the time of the acts allegedly constituting the offense. So, for example, one would still be "using" their vehicle if they were "repairing his car, changing a tire, or pumping gas at the gas pump." *Cooksey*, 309 Ill. App. 3d at 851 (McBride, J., dissenting). We also find that the determination of whether the victim was using the vehicle has both spatial and temporal elements. For example, one who parks their car, turns off the ignition, steps out of the car and closes the door, and is immediately accosted for their keys, or is knocked unconscious after they cross the street and has their keys taken, may be said to still be "using" the vehicle at that time (or, in the language of *Cooksey*, may be said to still be a "driver or passenger" of the vehicle at that time). The decisions in *Robinson* and *Ricardo A.* are in accord with this reading of the statute and *Cooksey*.

¶ 31    In *Robinson*, the victim had parked her car four hours earlier and happened to be walking nearby when the offense occurred. *Robinson*, 383 Ill. App. 3d at 1066-67. The victim was trying to return to her *home* when the defendant attacked her, took her car keys, and subsequently took her car. *Id.* The victim in *Robinson* was several houses away from the car, had not recently

exited the car, and was not in (immediate) control of the car (*i.e.*, the car was not running and there is no evidence the victim had keys in hand) when it was taken. *Id.* at 1071. This is unlike the victim in *Ricardo A.*, who had been driving his car, pulled over to talk to his eventual assailants, exited the car and was severely beaten, and was talking to a defendant at the car window when it was taken. *Ricardo A.*, 356 Ill. App. 3d at 983-84.

¶ 32 Having determined that distance alone is not the determining factor, the temporal and spatial limits on this more expansive reading of the statute and what factors might go into a potential "use" analysis for purposes of the vehicular hijacking statute will be explicated with further application. No matter, because whatever the boundaries of those considerations are, based on the existing authorities the evidence in this case is sufficient to prove beyond a reasonable doubt the "immediate presence" element of the offense under *Cooksey*, *McGee*, *Ricardo A.*, and *Robinson*.

¶ 33 The evidence was sufficient to prove the "immediate presence" element of the offense beyond a reasonable doubt. Tirado had purposefully parked his vehicle behind the vehicle defendant was driving to prevent defendant from leaving the scene. When Tirado exited his vehicle, he left the keys in it and the engine running. (We believe these are indices Tirado was still "using" the vehicle at the time.) He then approached the vehicle defendant was in, which was adjacent to his own vehicle. Tirado only fled from his vehicle when defendant shot him. Tirado was returning to the scene and his still running vehicle when defendant entered it and drove it away. Thus, unlike the victim in *Cooksey*, Tirado was at least approaching the vehicle and a reasonable juror could infer Tirado was attempting to gain entry to his vehicle. *Cf. Cooksey*, 309 Ill. App. 3d at 848. Unlike the victim in *McGee*, Tirado did not remain inside while the vehicle was taken. *Cf. McGee*, 326 Ill. App. 3d at 170. Unlike the victim in *Robinson*,

a reasonable juror could infer Tirado was in immediate control of the vehicle—he left the engine running and the vehicle was not properly parked such that, but for defendant's taking, a reasonable juror could infer Tirado would have returned to and moved the vehicle after the confrontation with defendant during which defendant shot Tirado forcing him to run away. *Cf. Robinson*, 383 Ill. App. 3d at 1071. Finally, *like* the victim in *Ricardo A.*, Tirado remained both physically near the vehicle and in its control (in *Ricardo A.*, standing outside the vehicle with keys in hand while here, not parked, keys in ignition, engine running) when the offender forced him away. *Cf. Ricardo A.*, 356 Ill. App. 3d at 983-84.

¶ 34    Regardless of the precise distance he was from the vehicle Tirado was still "at hand" and in immediate control of his vehicle—when Tirado exited the mall and started toward his vehicle he could see it still running in the parking lot and it is reasonable to infer he would have returned to move the vehicle had defendant not just shot him and shortly thereafter entered the vehicle and drove it away. In other words, despite defendant's argument that he was not, we find Tirado was still using the vehicle when defendant took it. Specifically, one way Tirado was "using" the vehicle was to block defendant's escape—which, ironically, would have been successful had defendant *not* taken the vehicle. Thus, we hold that Tirado was in the immediate presence of his vehicle when defendant took it for purposes of the aggravated vehicular hijacking statute.

¶ 35    Next, we turn to defendant's argument he did not take the van by "force." Defendant relies on the finding in *Cooksey* that "the use of force or threat of force need not transpire before or during the time the property is taken; rather, the force may be used as part of a series of events constituting a single incident." *Cooksey*, 309 Ill. App. 3d at 849. Defendant's argument in this case is premised primarily on the trial court's comments during sentencing which he contends constitute a finding by the trial court that the taking of the van was *not* part of a single continuing

incident as the shooting. At sentencing, the trial court sentenced defendant on each count in succession. When it got to the count for aggravated vehicular hijacking, the court stated as follows:

> "As far as the aggravated vehicular hijacking is concerned, the sentence is 6 to 30 years. [Defendant] had already shot that man in the testicles, and then when all is completed and Mr. Tirado is lying on the ground on the other side of that car some distance away, [defendant] leaves that scene. [Defendant] does not have to steal a car in order to leave the scene, but he does. That too, was a separate act and separate course of conduct. I do not believe that 6 years is appropriate, the minimum. [Defendant] took that car by the display of a weapon and wrecked it. I sentence him to 8 years in the Illinois Department of Corrections, that sentence to run consecutive to all of the other sentences for a total of 98 years in the Illinois Department of Corrections."

The State disputes defendant's characterization of the trial court's comments and argues the trial court's comments only indicated that the vehicular hijacking constituted a separate *offense* from the attempt (first degree murder), aggravated battery, and aggravated kidnapping, not that the shooting was not part of a single continuing incident as defendant claims.

¶ 36    The *Cooksey* court was addressing the defendant's argument in that case that the State failed to prove he used force or the threat of force to cause the victim to relinquish the bank deposits and, therefore, his robbery conviction had to be reversed. *Cooksey*, 309 Ill. App 3d at 848. Accordingly, the *Cooksey* court looked to decisions construing the robbery statute. See *id.* This court has consistently looked to the robbery statute and decisions interpreting the robbery statute to construe the language of the vehicular hijacking statute. See *People v. Aguilar*, 286 Ill.

App. 3d 493, 497 (1997) ("the question at bar can be resolved with reference to cases under the robbery statute, which contains language virtually identical to that at issue in the vehicular hijacking statute."), see also *People v. Jackson*, 2016 IL App (1st) 133823, ¶ 50 ("The language of these statutes is so similar that vehicular hijacking could be fairly described, for all practical purposes, as robbery of a specific kind of property, a motor vehicle. Given the similarity in language, this court has previously analogized to the robbery statute when interpreting the vehicular hijacking statute.").

¶ 37    In *Aguilar*, as in this case, the defendant argued that his conviction for aggravated vehicular hijacking had to be reversed because the State "failed to link the taking of the van to any forcible conduct on the part of the defendant." *Aguilar*, 286 Ill. App. 3d at 497. This court rejected that argument and held "there was a sufficient concurrence between the taking of the property and the use of force to constitute vehicular hijacking" in that case. *Id.* at 498. In *Aguilar*, the victim testified that he stopped his vehicle in the street because the street was blocked by another vehicle with three people standing around it. *Id.* at 494. As the victim attempted to drive around the stopped vehicle and people standing around the stopped vehicle, one of those people, the defendant, kicked the victim's vehicle. *Id.* The victim then stepped out of his vehicle leaving the engine running. *Id.* The defendant then punched the victim and the others threw bottles at the victim striking him. *Id.* The victim fled to his home about six feet down the block where he looked back at his vehicle to see one of the other men enter the driver's side and the defendant in or near the passenger seat. *Id.* at 495-96. The men drove the victim's vehicle away and the victim went inside his home and called police. *Id.* at 496. The victim testified "no one ever threatened him or told him to get out of his van." *Id.* On appeal, the defendant argued the State failed to prove the van was taken by force because the victim "left the

vehicle on his own accord with the engine running, and the beating and bottle-throwing that precipitated [the victim's] flight were unrelated to any intent to take the van." *Id.* at 497.

¶ 38       As noted above, the *Aguilar* court found that the question raised in that case could be "resolved with reference to cases under the robbery statute, which contains language virtually identical to that at issue in the vehicular hijacking statute." *Id.*[4]  The *Aguilar* court wrote as follows:

> "In order to commit robbery, the defendant must use force or the threat of force as a means of taking the property from the victim.  [Citation.]  However, it is unnecessary that the taking directly follow the force: there need only be some concurrence between the defendant's threat of force and the taking of the victim's property, and it need not be shown that the force was exerted for the purpose of taking the property.  [Citations.]  'If, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, *without having formed the intention before the fight began*, takes the money of the vanquished one, the offense committed is robbery.'  (Emphasis in original.)  [Citations.]  The fact that the victim is reduced to a state of physical non-resistance before his property is taken does not relieve the crime of the quality constituting robbery.  [Citation.]  Further, the fact 'that there was no demand or threat of a holdup is of no moment,' as this very argument has been considered and rejected.  [Citations.]" *Id.*, citing *People v. Lewis*, 165 Ill. 2d 305, 337 (1995).

---

[4]       "The robbery statute states that '[a] person commits robbery when he *** takes property *** from the person or presence of another *by the use of force or by threatening the imminent use of force*.'  (Emphasis added.)  720 ILCS 18–1(a) (West 1994)." *Aguilar*, 286 Ill. App. 3d at 497.

¶ 39    Based on the foregoing, the *Aguilar* court found that the defendant's conduct in beating the victim, throwing bottles at him, and then taking his van "amounted to a series of continuous acts as contemplated under *Lewis*." *Id.*  The court concluded the attack on the victim "forced him to leave the area, after which the defendant and his friends took the van.  Thus, there was sufficient concurrence between the taking of the property and the use of force to constitute vehicular hijacking." *Id.*  Similarly, defendant's shooting of Tirado forced Tirado to leave the area, after which defendant took the van.  Notwithstanding, defendant cites *People v. Cackler*, 317 Ill. App. 3d 645, 648 (2000), for the proposition that "[t]here was no evidence that defendant determined before, or close to the time of, the [force] that he would remove [Tirado's] property." Defendant's argument is unpersuasive.  Here, as in *Aguilar*, it is irrelevant that the shooting was "unrelated to any intent to take the van." *Aguilar*, 286 Ill. App. 3d at 497.  *Cackler* is inapposite.

¶ 40    In *Cackler*, the defendant murdered the victim in a residence after which the defendant "sat in the bathtub 'for a long while[]' " before then going to a grocery store where the defendant purchased trash bags for disposing of the body.  *Cackler*, 317 Ill. App. 3d at 646.  The defendant then took the victim's property and put it in the trash bags for the purpose of making the murder "look like a robbery" and "so that police would think someone had mugged the victim and would not think [the defendant] had done the murder." *Id.*  This court held that "there was a sufficient time interval between the murder and the taking of the victim's property that the acts were not a series of events constituting a single incident." *Id.*  This court noted that the defendant "did not remove the property from the victim until after he bathed for a long time and returned from a trip to the grocery store." *Id.* at 647-48.  This court also noted that "the only evidence of [the] defendant's motivation for taking the property was that he desired to conceal his involvement[;]" thus, there "was no evidence that [the] defendant determined before, or close to the time of, the

murder that he would remove the victim's property. As there is no evidence that [the] defendant used the force in order to obtain the property, his conviction for armed robbery must be reversed." *Id.* at 648.

¶ 41    Initially we note the time interval between defendant's shooting of Tirado and taking his van is not comparable to the time required to bathe for a "long while" then go to the grocery store to buy garbage bags to dispose of the victim. Thus *Cackler* is not helpful to a resolution of this issue. Moreover, *Cackler* cannot be read to stand for the proposition that, in general, a defendant must form the intent to take property "before, or close to the time of," inflicting violence on the owner of the property to support a conviction for taking property by force. Such a finding would be contrary to our supreme court's clear direction, recognized in *Cackler*, that "[a]s long as there is some concurrence between the threat of force and the taking of the property, a conviction for [the taking] can stand." *Id.* at 647, citing *Lewis*, 165 Ill. 2d at 339. *Cackler* only stands for the proposition that the required concurrence was not present based on the circumstances of that case. Those circumstances are completely different from the circumstances of this case and defendant has not demonstrated, or attempted to demonstrate, any similarity between them. We find the circumstances of this case akin to those in *Aguilar* where the owner of a vehicle was attacked for some reason other than to acquire the vehicle, the owner fled the area of the vehicle a short distance, and, as a result of that fleeing, the defendant was able to take the vehicle unimpeded. We find, as did the *Aguilar* court, that there was a "sufficient concurrence between the taking of [Tirado's van] and the use of force against [Tirado] to constitute vehicular hijacking." See *Aguilar*, 286 Ill. App. 3d at 498.

¶ 42    Nor are we persuaded by defendant's argument the trial court found the taking of the van to be a separate act. After reviewing the evidence, the trial court stated it would proceed "in

chronological order with the crimes that *** defendant committed, which the jury found him guilty of." The court started with the two counts of aggravated kidnapping of the two children and sentenced defendant to "10 years in the Illinois state penitentiary on each of the aggravated kidnapping charges, those charges to run concurrently." The court then turned to the attempt (first degree murder) charge for shooting Tirado. The court found that "[a]s far as the aggravated battery of Mr. Tirado, that will merge into the greater charge of attempt murder of Mr. Tirado." The court sentenced defendant to 35 years' imprisonment and found that attempt (first degree murder) "was totally unrelated to the kidnapping of those children *** and was a separate course of conduct and a separate act, *and the 35 years will run consecutive to the ten years, making that now 45 years*." (Emphasis added.) Next the court turned to the attempt (first degree murder) charge for Santos and again ruled that the aggravated battery of Santos would merge into the attempt (first degree murder). The court sentenced defendant to 45 years' imprisonment for Santos's attempt (first degree murder) and found that offense was "a separate act" that "had nothing to do with his attempt to kill Mr. Tirado." The court found that the attempt to kill Santos "was a separate and distinct course of conduct and a separate act, *and I find that the 45-year sentence shall run consecutive to the other two sentences of 10 years and 35 years for a total of 90 years*." (Emphasis added.) The court sentenced defendant to 10 years' imprisonment for aggravated discharge of a firearm, "that sentence to run concurrent with the attempt first-degree murder with Ms. Santos, so we are still at 95 (*sic*) years." Finally, the court turned to the aggravated vehicular hijacking. The court stated defendant

> "had already shot that man in the testicles, and then when all is completed and
> Mr. Tirado is lying on the ground by the car, that *** defendant got out of and
> Ms. Santos is lying on the other side of that car some distance away, he leaves

that scene. He does not have to steal a car in order to leave the scene, but he does. That, too, was a separate act and separate course of conduct. \*\*\* *He took that car by the display of a weapon* and wrecked it. I sentence him to 8 years in the Illinois Department of Corrections *that sentence to run consecutive to all of the other sentences* for a total of 98 years in the Illinois Department of Corrections." (Emphasis added.)

¶ 43    The trial court did not find that defendant's use of force against Tirado was *not* "a series of events constituting a single incident" (*Cackler*, 317 Ill. App. 3d at 646) for purposes of determining whether defendant took the vehicle by force. On the contrary, the court found defendant "took that car by the display of a weapon." Reading the trial court's comments in context, we believe the court found defendant's multiple offenses separate and distinct from one another only for purposes of determining defendant's aggregate sentence. Section 5-8-4(f)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-4(f)(2) (West 2018)) states as follows:

> "For sentences imposed under the law in effect on or after February 1, 1978, the aggregate of consecutive sentences for offenses that were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective shall not exceed the sum of the maximum terms authorized under Article 4.5 of Chapter V for the 2 most serious felonies involved, but no such limitation shall apply for offenses that were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." 730 ILCS 5/5-8-4(f)(2) (West 2018).

¶ 44    In this case, during sentencing, each time the trial court found that an offense was "separate and distinct" the court contemporaneously calculated the aggregate term defendant

would have to serve in prison. Defendant's argument implying a different meaning to the trial court's pronouncements fails. Regardless whether we agree with defendant's characterization of the meaning of the trial court's statements, "the trier of fact alone is entrusted with the duties of examining the evidence and subsequently determining whether the State has met its burden of proving the elements of the charged offense beyond a reasonable doubt." *People v. Lara*, 2012 IL 112370, ¶ 46. Where the defendant challenges the sufficiency of the evidence to sustain a conviction, the relevant inquiry is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis added.) *Harris*, 2017 IL App (1st) 140777, ¶ 27. Here, the evidence was sufficient to permit a rational trier of fact to conclude that there was a sufficient concurrence between the shooting and the taking of the vehicle to constitute aggravated vehicular hijacking. Accordingly, defendant's conviction for aggravated vehicular hijacking is affirmed.

¶ 45                    (b) Prosecutor's Comments During Closing Argument

¶ 46    Next, defendant argues the prosecutor "relied on an explicit emotional appeal that had nothing to do with the questions of fact before the jury and suggested [defendant] had committed prior bad acts that were not in evidence, depriving him of a fair trial." Defendant admits he failed to object to these statements by the prosecutor but asks us to review his arguments under the plain-error rule. However, "before considering whether the plain-error exception applies, we must first determine whether any error occurred." *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009).

> "Whether statements made by a prosecutor at closing argument were so
> egregious that they warrant a new trial is a legal issue [that] this court reviews *de
> novo*. [Citation.] Closing argument must serve a purpose beyond inflaming the

emotions of the jury. [Citations.] A prosecutor cannot use closing argument simply to inflame the passions or develop the prejudices of the jury without throwing any light upon the issues. [Citations.] Nonetheless, a 'substantial prejudice' inquiry applies to determine if there is reversible error:

> In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. [Citation.] Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. [Citations.]

In other words, [w]hile a prosecutor may not make arguments or assumptions that have no basis in evidence, even improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. [Citations.]" (Internal quotation marks omitted.) *Harris*, 2017 IL App (1st) 140777, ¶¶ 60-61.

¶ 47    First, with regard to the State's alleged emotional appeal, defendant complains about the following statement by the prosecutor: "They will never sleep the same at night. They will never part from their children again with a sense of security or the peace of mind that so many of

us take for granted. They are physically changed for the rest of their life, and there is absolutely nothing any of you can do to change that. But there is something that you can give them, and that's justice. Find him guilty." These were the last words of the State's initial closing argument. On appeal defendant argues these comments have nothing to do with the question before the jury of whether defendant committed the crimes charged and their only purpose is to "elicit an emotional response of sympathy for the victims and anger toward [defendant;]" and, defendant argues, the prosecutor's comments were not based on any evidence where "there was no evidence of any lasting psychological or emotional harm to Santos or her children." The State responds "the complained-of comments were not error, did not deprive defendant of a fair trial, and were not of such nature that in the absence of the comments the jury would have reached a different verdict."

¶ 48    The comments quoted above were not improper. The State argues the comments were reasonable comments based on the evidence and common sense about the impact that this crime had on the victims. We agree that "the State is entitled to comment on the evil effects of the crime" (*People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 58) and find that the complained-of comments quoted above fit into that category. The State notes both Santos and Tirado testified to lasting permanent injuries they suffered as a result of defendant's crimes. Santos had scars and no feeling in part of her hand, and Tirado still has bullet fragments in his body. As for defendant's argument there was no evidence of any lasting psychological or emotional harm to Santos or her children, the State argues that after an incident like the one in this case it is reasonable to infer that a parent would subsequently find it difficult to part with a child with the same sense of security that parent had before the incident and that the incident would have a negative impact on the victims' ability to sleep. "Statements which are based upon facts in

evidence, or upon reasonable inferences drawn from the evidence, are within the scope of proper argument. [Citation.] Moreover, it is not improper for a prosecutor to comment upon the evils of crime and its impact on the victim." *People v. Bell*, 234 Ill. App. 3d 631, 638 (1992). "A prosecutor may properly 'denounce a defendant's behavior, engage in some degree of invective and draw [reasonable] inferences unfavorable to the defendant if such inferences are based upon the evidence.' [Citations.]" *People v. Gonzalez*, 388 Ill. App. 3d 566, 595 (2008). "A prosecutor may properly argue that defendant engendered fear in the witnesses when it is based on the evidence." *People v. Fort*, 248 Ill. App. 3d 301, 318 (1993).

¶ 49    The prosecutor's comments about the non-physical effects on the victims in this case are reasonable inferences, albeit ones that are unfavorable to defendant, that can be drawn from the evidence. The inference that Santos will have some unease in being away from her children or difficulty sleeping is a logical one. "A prosecutor can argue any logical inference that can be drawn from the evidence." *People v. Robinson*, 199 Ill. App. 3d 24, 36 (1989). Accordingly, we find no error in these comments.

¶ 50    Second, with regard to the alleged implication that defendant committed prior bad acts that were not in evidence, defendant complains about the following statement by the prosecutor in rebuttal:

> "And why did [Santos] get out of the car? Why did she get out of the car? She got out of the car because when he is in the car and he forces her over to the passenger seat of the car, he said you're going to see how crazy I am today, and that's exactly what he showed her. She got out of the car because once he said that, she knows [defendant.] She knows him. She's known him for ten years.

> She knows what he's capable of. And so she decided to get out of that car and hope that he would follow behind her."

Defendant argues the statement "She knows what he's capable of" implies "that Santos and the prosecutor had knowledge that [defendant] had committed bad acts in the past."

¶ 51 "It is error to comment on facts which are inadmissible ([citation]), or to suggest that evidence of guilt existed which, because of defendant's objection, cannot be brought before the jury." *People v. Emerson*, 97 Ill. 2d 487, 497 (1983). An "inference that [the] defendant had been guilty of improper conduct *** [leaves] the jury free to speculate as to the nature of that misconduct. This court has recognized that an insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted specific proof." *Id.* In *Emerson*, the prosecutor stated: " 'Well, ladies and gentlemen, we can't tell you everything he did after his arrest and he knows it. Maybe when this is over I will tell you what he did when he was arrested.' " *Id.* at 496. The prosecutor in this case did not make so strong an insinuation of prior bad conduct as did the prosecutor in *Emerson*. Therefore, we find that decision of little utility.

¶ 52 The State argues the prosecutor's comments quoted above were in direct response to defense counsel's closing argument that Santos "chose to willingly exit the car that day." The State further argues the prosecutor's argument did not imply knowledge of bad acts that defendant committed in the past but rather was an argument as to why Santos got out of the car that was properly based on Santos's testimony that she had in fact known defendant for 10 years and she was scared defendant was going to try to fight with her in front of her kids.

¶ 53 Santos testified she has known defendant for over 10 years. She stated that when defendant pushed her to the passenger side of the car she felt scared. When asked why, she stated "I didn't want him to try to fight me in front of my kids." Prior to that, Santos testified,

they had a conversation in her car and defendant told Santos he wanted to talk about their relationship. Defendant tried to talk to her about their relationship two to three times before he "threw the car in park" while it was in motion "and snatched the keys out the car when [she] was driving." After defendant started to drive they continued to have a conversation in which defendant asked to see Santos's phone. When defendant threw the phone back to Santos and said "I'm going to show you I'm crazy today," Santos testified she was thinking defendant "was going to try to fight me." Santos then testified she "jumped out the car when the car stopped at the light" because she "didn't want him to fight me in front of my kids." Santos testified that when she got out of the car she was "thinking he would follow me where I was going *to try to get me*, and that way I would have the officer there to stop him." (Emphasis added.) When Santos entered the liquor store she told a worker "that someone might come in behind me him [*sic*] and told him he might try to fight me."

¶ 54    Despite no testimony concerning a physical confrontation Santos testified multiple times (without objection) that she was afraid of an impending fight with defendant while he was trying to talk to her about their relationship and committing the other acts (forcing himself to be able to drive, demanding to go through her phone) she testified to, none of which involved fighting with Santos (other than pushing her to the passenger side of the car). From this alone it is logical to infer Santos knew, or believed she knew, what defendant was "capable of." The prosecutor's isolated statement was a reasonable inference based on the evidence adduced at trial and therefore was not improper. See, *e.g.*, *People v. Green*, 2017 IL App (1st) 152513, ¶ 94 ("the State's remarks were not improper since they were made in response to the defense's argument and based on reasonable inferences from the evidence at trial"), *People v. Tolliver*, 347 Ill. App. 3d 203, 226 (2004) (comments properly based on testimony are not error). Regardless, we

would not find the prosecutor's comments were so prejudicial as to require reversal. *Harris*, 2017 IL App (1st) 140777, ¶ 61. As we have noted, Santos testified repeatedly, without objection, that she feared a physical confrontation with defendant that she did not want her kids to see. This testimony could have logically implied to the jury that defendant had become violent with Santos in the past or that she had seen him become violent in the past. In any event, in light of Santos's testimony and the other overwhelming evidence of defendant's guilt, the prosecutor's brief comment that Santos "knew what defendant was capable of" could not have contributed to defendant's conviction beyond a reasonable doubt. *Id.* ¶ 60, citing *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 55    Because we have found no error in the prosecutor's arguments, we can find no plain error, and defendant's argument fails. See *People v. Ramsey*, 239 Ill. 2d 342, 443 (2010) ("Because the State's arguments were proper, we also conclude that no clear or obvious error occurred and, therefore, we need not address the rest of defendant's plain-error argument.").

¶ 56                                     (c) Error in the Mittimus

¶ 57    Finally, defendant initially asked this court to correct the mittimus to conform to the trial court's oral pronouncement that the two counts of aggravated battery with a firearm merged with the two counts of attempt (first degree murder). The State responded that pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), the proper remedy is to "remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e). Defendant agrees this is the proper remedy, as do we. Therefore, pursuant to Rule 472, we remand to the circuit court to allow defendant to file a motion pursuant to Rule 472 raising the alleged error regarding the mittimus. Ill. S. Ct. R. 472 (eff. May 17, 2019). *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 34.

¶ 58                                    CONCLUSION

¶ 59     For the foregoing reasons, the circuit court of Cook County is affirmed, and the cause is

remanded for further proceedings consistent with this order.

¶ 60     Affirmed; cause remanded.