2020 IL App (1st) 181968-U

FOURTH DIVISION
August 13, 2020

No. 1-18-1968

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of<br>) Cook County |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) No. 17 CR 60219 |
| KEJUAN JENKINS, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) Honorable<br>) James Michael Obbish,<br>) Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County finding defendant guilty of robbery where (1) the State's evidence was sufficient to prove the identity of defendant as the offender beyond a reasonable doubt and (2) the State was not required to prove defendant knew the victim was age 60 or over in order to sentence him as a Class 1 offender.

¶ 2    Following a bench trial, defendant Kejuan Jenkins was acquitted of two counts of aggravated battery but found guilty of robbery and sentenced to 6 months' imprisonment and two

years of probation.  On appeal, defendant argues the evidence was insufficient to find him guilty

beyond a reasonable doubt where the only evidence linking him to the crime was the unreliable

identification testimony of the victim and an eyewitness.  In the alternative, defendant argues that

the evidence was insufficient where the State failed to prove that he knew the victim was 60

years of age or over and therefore his conviction should be reduced to a Class 2 robbery.  For the

reasons which follow, we affirm.

¶ 3                                  BACKGROUND

¶ 4      Defendant was charged by information with robbery (720 ILCS 5/18-1(a) (West 2016))

and two counts of aggravated battery (720 ILCS 5/12-3.05(c), (d)(1) (West 2016)) where it was

alleged he took a necklace from Willie Hester, a person who was 60 years of age or over, by the

use of force or by threatening the imminent use of force.

¶ 5      Willie Hester, who was 67 years old at the time of the June 2018 trial, testified as

follows.  On August 10, 2017, between 9:30 and 9:45 a.m. she was walking on E. 74th Street

toward St. Mark AME Zion Church to inquire about a reception for her husband's funeral.  She

was wearing a cross necklace her son had given her.  As she walked east on E. 74th Street, she

observed two men on the southern side of the street who were also walking east.  According to

Hester, she could not help but notice their appearance; one had his hair in braids or dreads and

was wearing a red t-shirt and the other had a dirty bandage on his arm.  Hester identified

defendant in court as the individual she observed wearing the red t-shirt.  Defendant crossed E.

74th Street and was at the mouth of the alley next to the church just as she approached the alley.

Defendant asked her if she had a cell phone he could use.  When she replied, "no," defendant

grabbed her on the left side of her neck.  The other man had crossed the street and was standing

side-by-side next to defendant with his hand raised in a fist and said, "[Y]ou shut up.  Shut the

'F' up." Hester believed the man would hit her and she began screaming, "Jesus, Jesus, Jesus." The man with the bandage turned and walked quickly across the street. Then defendant grabbed her on the right side of the neck. As he did, she felt her necklace come off. Defendant then fled across the street.

¶ 6    As defendant and the other man fled, Hester continued watching them. As she watched them, she felt around with her left foot looking for her shoe that had fallen off during the altercation. According to Hester, "I didn't take my eyes off of them." She became weak in the knees and some people she did not know assisted her. The paramedics were called, and she was treated in an ambulance.

¶ 7    While she was being treated in the ambulance, an officer brought defendant over to her to see if defendant was the person who grabbed her. Hester testified she identified defendant as the individual who grabbed her. Hester further testified that she had observed defendant the day prior when he walked in front of her house as she was sitting on her porch.

¶ 8    On cross-examination, Hester testified that when the man with the bandage raised his fist to her, she was looking at him. As she was being attacked, she heard a horn honk, but that did not draw her attention away from the individuals who were robbing her. She could view them both as they were standing side-by-side. According to Hester, this was a "very stressful" event that lasted five minutes but that also "happened so fast." On redirect, Hester testified that when defendant grabbed her neck, he was close enough "to kiss him." On recross-examination, defense counsel inquired about an answer Hester previously provided at a preliminary hearing wherein she testified that defendant only grabbed her on the right side. Hester could not recall giving that testimony; however, the parties later stipulated that Hester did testify at the preliminary hearing that defendant grabbed her only on the right side.

¶ 9    Cassiette West-Williams testified that on August 10, 2017, sometime after 9 a.m. she was driving her grandson to St. Mark AME Zion Church for a summer program.  As she turned left onto E. 74th Street from S. Cottage Grove Avenue, she observed two men attacking Hester.  She parked her vehicle in front of the alley, leaned on the horn, rolled the windows down, and started yelling.  West-Williams identified defendant as one of the individuals who she observed attacking Hester.  According to West-Williams, defendant "had his hand down her bra.  Her shirt was torn, it was ripped, and his hand was down around her neck and down her bra."  The other man, who had a bandage on his arm, ran away and defendant followed.  West-Williams then exited her vehicle to assist the victim and sent her grandson into the church to get help.  West-Williams covered the victim's chest, as it was exposed, and looked for Hester's shoes but could not find them.  Hester also instructed her to look for a cross necklace, but West-Williams could not find it either.  The police arrived and asked West-Williams to identify the attacker.  She entered the backseat of the police cruiser and the police randomly drove around the neighborhood.  As they drove, she observed defendant standing on a porch and identified defendant as the attacker to the police officers.  He was wearing a red shirt at the time of the attack and when she identified him for the police.

¶ 10    On cross-examination, West-Williams testified that she did not know Hester at the time of the attack.  She also could not say what color shirt or pants the man with the bandage was wearing.  She also could not recall the type of red shirt defendant was wearing or the color of his pants.  West-Williams did, however, identify defendant as having dreadlocks.  West-Williams further testified that she cooperated with the police and provided them with a valid address and phone number so they could contact her.

¶ 11    Officer Peter Ujda testified that at 10 a.m. on August 10, 2017, he responded to a battery

at St. Mark AME Zion Church. While at the scene, West-Williams approached him and told him she had observed the incident. Officer Ujda inquired whether she would be able to recognize the offender and West-Williams replied in the affirmative. Officer Ujda then asked West-Williams if she would drive with him in his squad car to look for the offender. West-Williams agreed and was seated in the back seat. Officer Garza was also in the squad car with them.[1] Officer Ujda randomly drove west down E. 74th Street and turned south down S. Evans Avenue. As they were approaching the middle of the block, West-Williams pointed to defendant who was standing on a porch and identified him as the offender. Defendant was wearing a red t-shirt. According to Officer Ujda, there was no hesitancy in West-Williams' identification, and he asked her "a couple of times" whether he was the offender and she continued to identify defendant. Officer Ujda then requested defendant come toward the police vehicle and he was handcuffed.

¶ 12    On cross-examination, Officer Ujda testified defendant complied with his directions. He further testified that the incident report for the offense indicated that defendant was arrested at 10:11 a.m. and both Hester and West-Williams identified defendant as the offender at 10:12 a.m. Officer Ujda clarified that West-Williams identified defendant first and Hester identified defendant at the scene.

¶ 13    The State then rested and the defense presented the testimony of five witnesses.

¶ 14    Taylor Randall, defendant's girlfriend, testified she was 18 years old at the time of the trial and resided in the area of E. 74th Street and S. Cottage Grove Avenue. On August 9, 2017, the day prior to the incident, she was at her residence with a hair-dressing client. At midnight, defendant came over, but she had not finished with her client and defendant fell asleep. At 12:30

---

[1] Officer Garza's first name does not appear in the record.

a.m. she had finished and then defendant woke up around 1 a.m. They decided to walk to defendant's residence in the 7200 block of S. Champlain Avenue. They arrived at defendant's residence at 1:40 a.m. and fell asleep in his bedroom at 2 a.m. On August 10, 2017, defendant woke her up at 9:25 a.m. She was late for a client she had scheduled for 9 a.m. She and defendant left defendant's residence at 9:45 a.m. and she arrived home at 9:55 a.m. Defendant left without entering her home.

¶ 15    On cross-examination, Randall testified she found out defendant was arrested at 10:11 a.m. She had been taking a shower and her phone kept ringing, so she answered the phone. It was defendant's mother, Alexis Bailey, who informed her that defendant had been arrested. Bailey instructed Randall to go to E. 74th Street and S. Cottage Grove Avenue. Randall went there and observed defendant, but she did not speak with the police. According to Randall, she did not tell the police that she was with defendant at 9:30 a.m. because "I didn't get a chance to talk to the police." The first person she told was defendant's public defender.

¶ 16    Alexis Bailey, defendant's mother, testified that on August 10, 2017, she resided on the 7200 block of S. Champlain Avenue with defendant. At 9 a.m. she was present in her home along with defendant and Randall. At that time, she yelled at defendant for not doing the dishes the night before. He woke up and came to talk with her in her room. Defendant left the home at 9:50 a.m. to walk Randall home. Thereafter, Bailey received multiple phone calls regarding defendant's arrest. At 10:06 a.m. she arrived on S. Evans Avenue and observed defendant standing by a police vehicle.

¶ 17    On cross-examination, Bailey testified that when she got to S. Evans Avenue Randall was not present, so she called Randall until Randall answered the phone. Bailey further testified later on the evening of August 10, 2017, she brought defendant jogging pants, a sweater, and gym

shoes while he was at the police station because he had been wearing a tank-top and shorts.

¶ 18    Anthony Glenn testified he resides on the 7400 block of S. Evans Avenue where defendant was arrested and knows defendant through Bailey. On August 10, 2017, Glenn was sitting on his front porch when he observed defendant coming out of the alley.[2] Glenn instructed defendant to come over and Glenn asked him, "What's going on?" Defendant replied, "I don't know." Then Glenn viewed a police vehicle pull up and officers put handcuffs on defendant. Glenn then took a photograph of defendant and called defendant's mother. The photograph, which was admitted into evidence, showed defendant wearing black shorts, a red t-shirt with the sleeves cut off, and flip flops. While the quality of the image was not sharp, defendant's hair appeared to be styled in dreads or braids.

¶ 19    Defendant testified that on August 10, 2017, he resided with his mother. At midnight he went to Randall's house. She was still with a client so he sat on the bed and eventually dozed off. He woke up around 12:40 a.m. and he and Randall walked back to his house at 1 a.m. They watched some television, talked, and fell asleep. According to defendant, the next morning "I had woke up early, but I had never looked at the time because my mother was yelling at me about not doing my chores the day before." Defendant then fell back asleep. He woke up again and checked his phone, which indicated it was 9:21 a.m. Defendant left his room and spoke with his mother to ask her what she had been yelling about. Bailey told defendant he had to do his chores and defendant explained that he was going to walk Randall home and would do his chores later. At some time thereafter, defendant walked Randall home, dropping her off at the alley. As he was walking out of the alley, he saw the victim's grandson David Hester, drive past. David stopped his vehicle, looked, reversed, and then parked near the alley. Defendant kept walking.

---

[2] No testimony was elicited regarding the time of day Glenn spoke to defendant.

As he exited the alley, Glenn called to defendant to come over. Glenn informed him someone had just been robbed nearby and to be careful. Defendant responded that he did not have anything for anybody to take. Then the police arrived, asked him some questions, searched him, and handcuffed him. He was taken to the scene where he was viewed by Hester. When asked whether he robbed Hester, defendant said he did not.

¶ 20 On cross-examination, defendant testified that he was standing in front of Glenn's home at 10 a.m. when David flagged the police down. According to defendant, David directed the police officers to him.

¶ 21 Detective Socrates Mabry testified he was assigned to investigate this incident. He obtained West-Williams' contact information from the general case report and went to the address listed. He did not speak with West-Williams because the address was not valid. On cross-examination, Detective Mabry testified that the property located at the address was a church.

¶ 22 The defense then rested. After closing arguments, the trial court acquitted defendant of aggravated battery but found him guilty of robbery. In assessing the evidence, the trial court found West-Williams' independent testimony to be credible and defendant's testimony to be not credible. The trial court found that the error in West-Williams' address was likely a scrivener's error and did not affect her credibility, particularly where she testified in a "very credible manner." In addition, the trial court noted that the photograph of defendant taken while he was being arrested corroborated Hester's and West-Williams' testimony where they testified he was wearing a red t-shirt and had his hair in dreads or braids.

¶ 23 The matter proceeded to a sentencing hearing where the trial court heard evidence in aggravation and mitigation. The State argued that because Hester was over the age of 60 at the

time of the offense, defendant should receive a Class 1 sentence. Defendant maintained he should receive probation due to the nature of the offense and his lack of a felony criminal record. The trial court ultimately sentenced defendant to 6 months' imprisonment with 362 days of credit for time served and two years of probation. This appeal followed.

¶ 24                                ANALYSIS

¶ 25                        Sufficiency of the Evidence

¶ 26    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt where the only evidence linking him to the crime was the identification testimony of Hester and West-Williams which was unreliable and insufficient to support his conviction.

¶ 27    The State responds that a positive identification of a defendant by a single witness is sufficient to sustain a conviction, provided the witness had an opportunity to view the defendant under conditions permitting a positive identification. The State maintains that because Hester and West-Williams had an adequate opportunity to observe defendant under conditions permitting a positive identification the defendant's conviction should be affirmed.

¶ 28    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Martin*, 2011 IL 109102, ¶ 15. On review, all reasonable inferences from the evidence are drawn in favor of the State. *Jackson*, 443 U.S. at 318-19; *Martin*, 2011 IL 108102, ¶ 15. The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 29    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient but only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id.* However, the fact a trier of fact did accept testimony does not guarantee it was reasonable to do so. *Id.* Reasonable people may on occasion act unreasonably. *Id.* Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Id.* Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 30    Defendant here was convicted of robbery. A person commits robbery when he or she knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-1(a) (West 2016). In terms of sentencing, "robbery is a Class 2 felony, unless the victim is 60 years of age or over *** in which case robbery is a Class 1 felony." 720 ILCS 5/18-1(c) (West 2016). Defendant, however, does not contest the elements of the offense but instead challenges the reliability of Hester and West-Williams' identifications.

¶ 31    Where identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offenses. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). In assessing identification testimony, Illinois courts utilize a five-factor test established in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Slim*, 127 Ill. 2d 302, 307 (1989). The factors are "(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of

the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08. We will consider each factor in turn.

¶ 32 The first factor, the witnesses' opportunity to view defendant, favors the State. When considering whether a witness had an opportunity to view the offender at the time of the offense, courts look to "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979). Hester testified she first viewed defendant in broad daylight as he was walking parallel to her on the opposite side of the street. He then walked across the street toward her. He was in front of her as she approached the alley where he was standing. As he grabbed her neck, Hester testified his face was so close she could kiss him. While we acknowledge that there was a second individual who yelled at Hester with his fist raised as the offense occurred, it does not negate the fact that she was able to observe defendant's face during this time. Defendant observes that Hester's attention was divided between the two offenders, but even so, Hester testified the altercation lasted approximately five minutes and thus it cannot be said she did not have an opportunity to view both offenders in this time. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 24 (where viewing the offender's face for seconds in a well-lit area where his face was uncovered was a sufficient opportunity to view); *People v. Wallace*, 210 Ill. App. 3d 325, 339 (1991) (finding that a witness's identification was reliable where she observed the offender at close range, even if only for a few seconds).

¶ 33 Regarding West-Williams' opportunity to observe defendant, she testified she first observed him as she drove west down E. 74th Street. Defendant was attacking Hester at that time. While she did not expressly state that she viewed defendant's face, she did park her

vehicle directly next to the altercation and through the window watched defendant, honked her horn, and screamed. Based on this evidence, we believe the first *Biggers* factor weighs in favor of the State.

¶ 34    The second factor, the witnesses' degree of attention, favors the State. As previously discussed, Hester testified she first viewed defendant as he walked on the opposite side of the street. She viewed him for a long enough time to contemplate that he was likely walking to the bus stop. Defendant then crossed the street in front of her and met her at the mouth of the alley. Although defendant maintains that the threatening presence of the other robber divided Hester's attention during the robbery, Hester testified that even after the robbery had concluded she did not take her eyes off defendant. While the event was necessarily stressful, we find that Hester's degree of attention was high considering that she was able to view defendant before, during, and after the robbery.

¶ 35    West-Williams' degree of attention was also high. She testified that she pulled her vehicle over on E. 74th Street at the mouth of the alley and watched as defendant attacked Hester. West-Williams provided detailed information as to defendant's movements during the robbery. She also was alert enough to direct her grandson into the church to obtain assistance. This factor favors the State.

¶ 36    As to the third factor, we cannot evaluate the accuracy of the description Hester and West-Williams provided the police because neither witness gave detailed testimony regarding what they told the officers. This factor thus favors neither party.

¶ 37    The fourth factor requires us to consider the witnesses' level of certainty at the time of the identification procedure. Defendant argues we should not give this factor any weight because there are "low correlations between the witness's confidence and the accuracy of her

identification." *People v. Allen*, 376 Ill. App. 3d 511, 524 (2007). We observe that defendant

takes this quotation from *Allen* out of context. In *Allen*, the reviewing court made this statement

to describe what was included in a psychologist's report regarding the reliability of eyewitness

identifications. *Id.* While an expert psychologist may have made this statement, no such

evidence was introduced here at defendant's trial. The witness' level of certainty at the time of

the identification remains a factor in the *Biggers* analysis and has not been discounted by our

supreme court. See *In re M.W.*, 232 Ill. 2d 408, 435 (2009) (utilizing the witness' level of

certainty as a factor in determining whether the identification was reliable); *People v. Guerrero*,

2020 IL App (1st) 172156, ¶ 34 (observing that the witness' level of certainty remains a factor in

our analysis).

¶ 38    We find the fourth *Biggers* factor favors the State. Hester positively identified defendant

in a show-up that took place shortly after the robbery and again in open court. The record further

supports this conclusion as to West-Williams' identification. According to Officer Ujda, West-

Williams pointed defendant out and confirmed he was the offender multiple times, even after

Officer Ujda asked West-Williams if she was certain. West-Williams' testimony was clear that

defendant was the offender.

¶ 39    The final *Biggers* factor, the length of time between the crime and the identification, also

favors the State. The offense occurred at 9:45 a.m. West-Williams identified defendant at 10:12

a.m. and Hester identified him shortly after that. See *In re T.B.*, 2020 IL App (1st) 191041, ¶ 51

("The temporal and spatial closeness between the observations and the ultimate identifications

lend additional credence to [the witnesses'] testimony.").

¶ 40    Defendant asserts, however, that while both identifications were made quickly after the

incident, this factor has limited weight where Hester's identification was made during a show-up.

According to defendant, a show-up is an inherently suggestive procedure with a substantial error rate and scientific research has shown that even identifications made moments after the incident are not necessarily accurate because the rate of memory loss for an unfamiliar face is greatest right after the encounter and levels off over time.

¶ 41    We are mindful of the long-recognized risks associated with show-up identifications.  For example, once a witness has identified an individual in any pretrial identification procedure, "he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial."  (Internal quotation marks omitted.)  *United States v. Wade*, 388 U.S. 218, 229 (1967).  Additionally, there is the risk that a witness identifying a defendant at trial may be subconsciously remembering the defendant not from the crime scene but from the later (potentially suggestive) show-up procedure.  *In re T.B.*, 2020 IL App (1st) 191041, ¶ 55.

¶ 42    On the other hand, our supreme court has held that prompt show-ups near the scene of a crime are acceptable police procedure, as they are designed to aid the police in determining whether to continue or to end the search for culprits.  *People v. Lippert*, 89 Ill. 2d 171, 188 (1982).  Also, show-ups are not unduly suggestive just because defendants are in police custody when they are conducted.  *People v. Jones*, 2017 IL App (1st) 143766, ¶ 30.  Rather, show-ups implicate the due process clause only when they are so unnecessarily or impermissibly suggestive that there exists " 'a very substantial likelihood of irreparable misidentification.' "  *Id.* ¶ 27 (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994)).

¶ 43    Here, the record indicates that the police had ample reason to conduct a show-up rather than wait to assemble a photo array or a lineup.  Hester was robbed in broad daylight and, as discussed previously, had ample opportunity to view her robbers.  Within 30 minutes, West-

Williams identified defendant as one of the robbers and defendant was transported back to the scene of the offense. Hester's show-up identification allowed the police to determine that they did not need to continue to search for a culprit. See *Lippert*, 89 Ill. 2d at 188. Although defendant was in police custody during the show-up, this factor alone does not render the identification procedure unduly suggestive. *Jones*, 2017 IL App (1st) 143766, ¶ 30. That a show-up occurred in this case does not undermine Hester's identification.

¶ 44 Based on this analysis of the *Biggers* factors, we conclude that Hester and West-Williams' identifications of the respondent were reliable. See *Slim*, 127 Ill. 2d at 307 (even one reliable identification alone is sufficient to sustain defendant's convictions).

¶ 45 Defendant, however, asserts that his alibi evidence was strong and, while the trial court concluded that defendant's testimony was not credible, it made no similar findings regarding his other witnesses. According to defendant, the evidence he presented established that he was present at his residence until 9:45 a.m. when he walked Randall home. Then, after parting ways with Randall in the alley, he walked through the alley connecting S. Cottage Grove Avenue and E. Evans Avenue and walked past Glenn's residence at 10 a.m. where the police encountered him soon thereafter.

¶ 46 Viewing all the evidence in the light most favorable to the State, as we must, the evidence in this case sufficiently established that defendant robbed Hester at 9:45 a.m. on August 10, 2017. Although defendant presented an alibi defense, we note that the trier of fact is not obligated to find the testimony of alibi witnesses to be more credible than the testimony of the State's witnesses, especially where the alibi witnesses are related to the accused and possess an obvious bias. See, *e.g., People v. Gabriel*, 398 Ill. App. 3d 332, 342 (2010); *People v. Mullen*, 313 Ill. App. 3d 718, 729 (2000). Furthermore, the weight to be given alibi evidence is a

question of credibility for the trier of fact, and there is no obligation on the trier of fact to accept alibi testimony over positive identification of an accused. *Slim*, 127 Ill. 2d at 315. We reiterate that a reviewing court should not substitute its judgment for that of the trier of fact. *Jackson*, 232 Ill. 2d at 281. Here, the trial court heard the evidence and inconsistencies that defendant relies on to support his challenge to the sufficiency of the evidence and concluded that defendant was the individual who robbed Hester. Accordingly, we concluded that the State proved the identity of defendant beyond a reasonable doubt.

¶ 47    The State Proved the Victim was Over 60 Years of Age Beyond a Reasonable Doubt

¶ 48    Defendant next argues that the State failed to prove an element of robbery beyond a reasonable doubt: that he knew Hester was at least 60 years old at the time of the offense. According to defendant, the State was required to prove he knew Hester was age 60 or over as the robbery statute explicitly prescribes the mental state "knowingly" with respect to the offense as a whole. Defendant contends that because robbery is not a misdemeanor offense, nor does the robbery statute clearly indicate a legislative intent to impose absolute liability, there must be a culpable mental state for the "victim-age element." Defendant continues that section 4-3(b) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/4-3(b) (West 2016)) provides that where the statute defining an offense prescribes a particular mental state with respect to the offense as a whole without distinguishing between the elements of the offense, then that prescribed mental state applies to each such element. Defendant thus concludes that because the robbery statute explicitly sets out the mental state of "knowingly," the State was required to prove a culpable mental state of knowledge for the "victim-age element" of the offense. Defendant thus requests that this court reduce his sentence to a Class 2 robbery.

¶ 49    In response, the State asserts that the plain language of the robbery statute provides that

the victim must be over 60 years of age or over at the time of the robbery in order for the court to impose a Class 1 sentence, not that the defendant must know the victim is 60 years of age or older at the time of the offense. Accordingly, the State was not required to prove defendant's knowledge of Hester's age, only that she was over 60 years old at the time of the offense and defendant's Class 1 robbery conviction should stand.

¶ 50    The threshold issue here is whether the victim's age is an element of the offense of robbery. This argument raises an issue of statutory construction, which we review *de novo*. *People v. Baskerville*, 2012 IL 111056, ¶ 18. The primary objective when interpreting a statute is to ascertain and give effect to the intent of the legislature. *Id.* The best indicator of this intent is the statute's language, which is to be given its plain and ordinary meaning. *Id.* In determining the plain meaning of a statute, a court must consider the statute in its entirety and be mindful of the subject it addresses and the legislature's purpose in enacting it. *Id.* A court may not depart from the plain meaning of a statute and read into it exceptions, limitations, or conditions that are in conflict with the express legislative intent. *Id.* Only when the language of a statute is ambiguous may a court consider extrinsic aids, such as legislative history, to determine the meaning of the statutory language. *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 43.

¶ 51    Defendant does not cite any cases interpreting section 18-1 of the Criminal Code which require the State to prove the defendant's actual knowledge of the victim's age to support a conviction for robbery. Instead, defendant's argument relies on sections 4-3 and 4-9 of the Criminal Code. Section 4-3, entitled "Mental State" provides: "A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in Sections 4-4 through 4-7" (describing "Intent," "Knowledge,"

"Recklessness," and "Negligence"). 720 ILCS 5/4-3(a) (West 2016). Section 4-3(b) further provides that "[i]f the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each element." 720 ILCS 5/4-3(b) (West 2016). Section 4-9 of the Criminal Code entitled "Absolute liability," provides that "[a] person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor *** or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4-9 (West 2016). The crux of defendant's argument is that the knowledge of the victim's age is an element of the offense that the State must prove beyond a reasonable doubt for him to be sentenced as a Class 1 offender. As is clear from our case law, the victim's age is not an element of the offense and therefore defendant's argument fails.

¶ 52     The statute at issue here is section 18-1 of the Criminal Code (720 ILCS 5/18-1 (West 2016)). It provides as follows:

    "(a) Robbery. A person commits robbery when he or she knowingly takes
    property, except a motor vehicle covered by Section 18-3 or 18-4, from the person or
    presence of another by the use of force or by threatening the imminent use of force.

                                          * * *

    (c) Sentence.

    Robbery is a Class 2 felony, unless the victim is 60 years of age or over or is a
    person with a physical disability, or the robbery is committed in a school, day care center,
    day care home, group day care home, or part day child care facility, or place of worship,
    in which case robbery is a Class 1 felony." *Id.*

The elements of the offense of robbery are contained in subsection (a) of the statute. 720 ILCS 5/18-1(a) (West 2016); *People v. Lewis*, 165 Ill. 2d 305, 340 (1995) (explaining that the elements of robbery are "taking property by force or threat of force. Nothing more is required to sustain the conviction."). Pursuant to subsection (a), a person commits the offense of robbery "when he or she knowingly takes property, except a motor vehicle covered by Section 18-3 or 18-4, from the person or presence of another by the use of force or by threatening the imminent use of force." *Id.* Subsection (a) sets forth the conduct which the legislature proscribed. 720 ILCS 5/18-1(a) (West 2016). To obtain a conviction, the State need not prove anything more.

¶ 53    In a separate subsection entitled "Sentence," subsection (c) provides that the offense of robbery is a Class 2 felony. 720 ILCS 5/18-1(c) (West 2016). It then lists certain factors which increase an individual's sentence for robbery from one classification to a higher-level classification. *Id.* Specifically, in subsection (c), the legislature increases the penalty for any violation of the statute from a Class 2 felony to a Class 1 felony if "the victim is 60 years of age or over." *Id.* This sentencing provision does not create separate and distinct offense of robbery of a victim 60 years of age or over. See *People v. Green*, 225 Ill. 2d 612, 619-20 (2007) (Illinois has a single offense called "robbery" that is either a Class 1 or a Class 2 felony, depending upon the nature of the victim); *People v. Van Schoyck*, 232 Ill. 2d 330, 337 (2009) ("Under the plain language of the statute, there is only one offense of driving under the influence. *** The enhancing factors in subsection (c) [(sentencing)] do not create a new offense, but rather serve only to enhance the punishment."); *People v. Robinson*, 232 Ill. 2d 98, 112 (2008) (discussing that the involuntary manslaughter statute provides that if the victim was a family or household member then the offense is a Class 2 felony rather than a Class 3 felony and sets forth a sentencing-enhancement element rather than creating a separate and distinct offense); *People v.*

*Smith*, 2012 IL App (1st) 102354, ¶ 110 (the plain, unambiguous language of section 8-4(a) sets forth the elements of the attempt offense; section 8-4(c)(1), under the heading "Sentence," states that the sentence for the offense of attempted first-degree murder is the same as the sentence range for a Class X felony); see also *People v. White*, 2011 IL 109616, ¶ 26 ("[F]irst degree murder is a single offense—there is no separate offense of 'armed murder' or 'enhanced murder.' "). The plain language of the robbery statute demonstrates that the penalty enhancements in subsection (c) are not elements of the offense and it is the legislature's intent that they do not come into play until after the defendant is found guilty. This conclusion is further supported by our supreme court's recent statement that, "Aggravated battery requires knowingly causing great bodily harm and knowledge that the victim is 60 years of age or older; robbery does not." *People v. Smith*, 2019 IL 123901, ¶ 39; see also *People v. Pearson*, 331 Ill. App. 3d 312, 320 (2002) ("We disagree that the victim's age was an element of the offense of robbery. The elements of robbery are set out in section 18-1(a) of the Criminal Code of 1961. [Citation.] Age is not listed."). Thus, because the victim's age is not an element of the offense, defendant's argument that he must know that the victim is 60 years of age or older fails.

¶ 54    This conclusion also finds support in our supreme court's opinion in *People v. Green*, 225 Ill. 2d 612 (2007). In *Green,* the defendant was charged with one count of robbery. *Id.* at 614. The indictment alleged that the defendant committed the offense of robbery when he knowingly took property from "a person 60 years of age or over, by use of force, in violation of 720 ILCS 5/18-1(a) (Class 1 Felony)." *Id.* The matter proceeded to a jury trial and the jury was instructed on the charge of "robbery of a victim 60 years of age or over." *Id.* at 615. The elements instruction stated that, to sustain a charge of "robbery of a victim 60 years of age or over" the State was required to prove that the defendant knowingly took property from the

person or presence of the victim through the use of force and that the victim was 60 years of age or over. *Id.* The jury returned a signed verdict that stated: "We the jury, find the defendant *** guilty of robbery." *Id.* at 614. On appeal, the appellate court declared, *sua sponte,* that a "conflict" existed between the elements instruction and the verdict form. The court reasoned that this "conflict" violated the principles espoused in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the jury's verdict form indicated that it did not find each element of the offense of "robbery of a person 60 years of age or over" beyond a reasonable doubt. Accordingly, the appellate court reduced defendant's conviction for "robbery of a person 60 years of age or over," a Class 1 felony, to robbery, a Class 2 felony. *Id.* at 617-18.

¶ 55 The State appealed, and our supreme court rejected the appellate court's analysis of the alleged conflict. The court examined the robbery statute and found that it, much like the involuntary manslaughter statute, sets forth the elements of the offense of robbery at the outset, and then sets forth possible sentences, including an enhanced sentence based on the status of the victim. See 720 ILCS 5/18-1 (West 2004). The supreme court thus concluded that " 'robbery' and 'robbery of a person 60 years of age or over' are not distinct crimes, a fact that even a cursory examination of the robbery statute reveals. Rather, Illinois has a single offense called 'robbery' that is either a Class 1 or a Class 2 felony, depending upon the nature of the victim." *Green*, 225 Ill. 2d at 619.

¶ 56 We also find support in our decision in *People v. Harris*, 2017 IL App (1st) 140777. While defendant acknowledges that *Harris* is analogous to the case at bar, he maintains that the reasoning therein is flawed because the *Harris* court failed to consider the implications of sections 4-3 and 4-9 of the Criminal Code. We disagree with defendant's assessment of *Harris* and find that it aids our determination in this case.

¶ 57    In *Harris*, the defendant was found guilty of aggravated vehicular hijacking (720 ILCS 5/18-4 (West 2012)) where he knowingly took a motor vehicle from the victim and the victim was deaf. *Id.* ¶ 30.  On appeal, the defendant argued that the State failed to prove he was guilty of aggravated vehicular hijacking beyond a reasonable doubt where there was no evidence that the defendant knew the victim was deaf. *Id.*  After setting forth the language of the aggravated vehicular hijacking statute, section 4-3 of the Criminal Code, and case law precedent, the *Harris* court concluded that "although the 'knowing' mental state requirement [of vehicular hijacking (720 ILCS 5/18-3 (West 2012))] applies to the *act* of taking a vehicle by force, the State is not required to prove the defendant had knowledge of the victim's *characteristics* to support a conviction for aggravated vehicular hijacking under section 18-4(a)(1)."  (Emphasis in original.) *Id.* ¶ 36.

¶ 58    In reaching this conclusion, the *Harris* court noted that the legislature could have made the defendant's knowledge of the victim's characteristics part of the aggravated vehicular hijacking statute but did not.  As an example, the *Harris* court pointed to *People v. Jasoni*, 2012 IL App (2d) 110217, which involved the aggravated battery statute that had been amended to expressly require the defendant's knowledge of the victim's characteristics in order for the defendant to be found guilty of the aggravated form of the offense. *Id.* ¶ 16.  Comparing the language of the aggravated battery statute to that of the aggravated vehicular hijacking statute, the *Harris* court reasoned that "the legislature easily *could have* amended the aggravated vehicular hijacking statute to clarify a knowledge requirement.  Just as the legislature amended the aggravated battery statute to specify that the offense occurs when the defendant '[k]nows the individual harmed to be *** 60 years of age or older.' "  (Emphasis in original.)  (Internal quotation marks omitted.)  *Harris*, 2017 IL App (1st) 140777, ¶ 45 (quoting 720 ILCS 5/12-

4(b)(10) (West 2008)).

¶ 59 Statutory construction aside, the *Harris* court also based its decision on support from firearm possession cases where our courts have held that, although the State must prove knowing possession of the weapon, the State does not need to prove the defendant's knowledge of the firearm's characteristics. *Id.* ¶ 48. Particularly relevant to this case is *People v. Stanley*, 397 Ill. App. 3d 598, 600 (2009), wherein the defendant was convicted of violating a statute prohibiting the possession of a firearm where the manufacturer's serial number has been changed, altered, removed, or obliterated. After reviewing the provisions of section 4-3 of the Criminal Code, the *Stanley* court found that although the State must prove knowledge of the act of possession, the State need not prove the defendant's knowledge of the defaced character of the firearm. *Id.* at 607. As observed by the *Harris* court, *Stanley* addressed the arguable inconsistency with section 4-3(b) of the Criminal Code as follows:

"We recognize that it could be contended that there is an inconsistency between our holding and the language of section 4-3(b) of the Code. However, we find that no such inconsistency exists. Section 4-3(b) provides, in part: 'If the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to each element.' [Citation.] While this could arguably be read to require proof defendant knew of the nature of the defaced firearm, we find that this is not, in fact, the case. Instead, we discern that the elements of this offense are properly the *mens rea* and the possession, that is, the State must prove the knowing possession of the defaced firearm by defendant. The State, however, need not prove knowledge of the character of the firearm. Though the defendant unmistakably bears upon the commission of the offense, it is not an

element of the offense." *Id.* at 609.

¶ 60    In sum, we reject defendant's contention that section 4-3 requires the State prove his knowledge of Hester's age. Section 4-3 provides that "[i]f the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state *applies to each element*." (Emphasis added.) 720 ILCS 5/4-3(b) (West 2016). For section 4-3 of the Criminal Code to be implicated in this instance, the victim's characteristics, *i.e.,* age or disability, must be included as part of an element of the offense. Here, as in *Harris* and explained above, the victim's characteristics (and defendant's knowledge thereof) are not an element of the offense. See *Green*, 225 Ill. 2d at 619-20. Had the legislature intended to require defendant's knowledge of the victim's age, it could easily have included that language in the robbery statute, but no such language was included. See *Harris*, 2017 IL App (1st) 140777, ¶ 45. Moreover, the structure of the robbery statute itself supports the conclusion that the State is not required to prove defendant's knowledge of the victim's age. See 720 ILCS 5/18-1 (West 2016). Accordingly, section 4-3 does not apply as defendant suggests and the State is not required to prove defendant knew the victim was age 60 or over.

¶ 61                                CONCLUSION

¶ 62    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 63    Affirmed.